## GATLIFF COAL CO. v. COX.
### No. 10035.

Circuit Court of Appeals, Sixth Circuit.
Nov. 19, 1945.

See also 142 F.2d 876.

Tye & Siler, H. C. Gillis, and Robert L. Smith, all of Williamsburg, Ky., for appellant.

R. L. Pope, of Knoxville, Tenn., and C. B. Upton, of Williamsburg, Ky., for appellee.

Before HICKS, SIMONS and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Appellee, Maynard Cox, recovered a judgment against appellant, Gatliff Coal Company, in the District Court for the Eastern District of Kentucky in the sum of $10,045.00 and costs, and for an additional sum of $1000 for attorneys' fees to be paid to the attorneys of record of appellee for their services in his behalf.

The case was tried by the court without the intervention of a jury. The court made findings of fact and conclusions of law which were unexcepted to by appellant. The court also filed an opinion, printed in the margin,[1] which sets forth the issues

---

[1] OPINION OF DISTRICT COURT—Filed April 6, 1945.

These actions involve common questions of law and similar issues of fact. By agreement of the parties, for the purpose of trial, they were consolidated and tried by the Court without the intervention of a jury.

During the period here involved the defendant Gatliff Coal Company, a

Delaware Corporation, was engaged in operating several coal mines in Whitley County, Kentucky, and in marketing a substantial amount of the coal in interstate commerce. The plaintiffs were employed by defendant in operating its power house which furnished the power for the operation of all the mines, plaintiff Maynard Cox being an engineer and Ora L. Jones a fireman. Cox's employment covered the period from April 1, 1941, to and including March 31, 1943, and Jones worked from April 1, 1941, to and including June 30, 1942.

Prior to April 1941, the defendant's employees were unorganized and defendant's mines were operated under a non-union open shop policy. During early April 1941 the employees were organized and plaintiffs, along with other employees, became members of the miners' union known as District 19, United Mine Workers of America, which will be hereinafter referred to as the Union. At that time negotiations were in progress in Washington, D. C., between representatives of the United Mine Workers of America and the Southern Appalachian Coal Operators' Association (which will be hereinafter referred to as the Operators' Association), with a view to reaching a collective bargaining agreement to regulate and control rates of pay, hours of work and conditions of employment in the bituminous coal industry in the territory embracing that part of Kentucky in which defendant's mines are located and other adjoining states. The defendant was not, at that time, a member of the Operators' Association and was not represented at the wage conference then in progress.

Upon becoming affiliated with the Union, defendant's employees joined with the other union miners throughout the territory in the strike which had prevailed since the expiration of the previous union contract on April 1, 1941. This resulted in closing down defendant's mining operations.

The participants in the wage conference at Washington, recognizing the fact that negotiations as to the new collective agreement would be prolonged, and desiring to promote the National defense program by ending the pending strike, on April 30, 1941, entered into a temporary agreement to be effective during the negotiations and until final conclusion of a new agreement. By this arrangement, the terms of the old contract were, for the time being, to continue in effect, subject to certain specified wage increases. This temporary agreement, known and referred to as the "Washington Agreement," contained a provision extending its terms to any independent operators in the field who might wish to avail themselves of it.

As a condition of resuming work, the defendant's employees, through their Union, demanded that defendant recognize the Union as their bargaining agency, accept the terms and conditions of the temporary Washington Agreement and accept the collective bargaining agreement when it should be finally settled and entered into by the Operators' Association and the Union. Having indicated willingness to conform to these demands, defendant's mines resumed operation and on May 21, 1941, defendant's principal officials met with representatives of the local Union at the office of the defendant in Williamsburg, Kentucky. They reached a temporary agreement in regard to their differences and evidenced it by the following writings which were prepared by and at the office of the defendant's attorney, to-wit:

"This Agreement made and entered into this the 21st day of May, 1941, by and between the Gatliff Coal Company, of Williamsburg, Kentucky, party of the first part, and District No. 19, United Mine Workers of America, party of the second part, Witnesseth:

"It is agreed that this agreement is to be effective as of May 1, 1941.

"It is agreed that this contract is for the general use and benefit of the contracting parties, exclusively, as heretofore defined and set forth in this agreement.

"The undersigned coal company agrees to accept the agreement by and between District 19, United Mine Workers of America, and the Southern Appalachian Coal Operators' Association, with all its wages, hours of labor and provisions.

"The above company, party of the first part, agrees to put into force and effect the wages, hours of labor and working conditions that have been agreed upon in Washington, D. C., April 30, 1941.

"This temporary agreement is effective as of this date and shall apply until a formal ratification of the final agreement extending through March 31, 1943, is completed.

"Supplemental Agreement to the Gatliff Mine, Gatliff Coal Company, Gatliff, Kentucky to Agreement of Even Date.

"It is agreed that the rate paid for loading coal on conveyors on March 31, 1941, in the Rose Creek Mine and No. 3 Mine shall carry the increases of the Washington Agreement of April 30, 1941, and any other increases that may be

developed by the pleadings and the conclu-     sions of the court upon its findings.     We

agreed upon as affecting the coal operators in the Southern Appalachian area.

"It is further agreed that when machinery is moved from one location to a new place the crew shall be given the chance to move the equipment to the new location, providing they are eligible for work. When the crew is employed to move conveyor equipment to a new location they shall be paid at the rate of $6.60 per shift.

"It is further agreed that the power house is to be discontinued as soon as TVA power or a contract with some utilities company can be arrived at. The employees doing the work in the said power house shall continue as in the past and receive the one dollar per day increase and any other increase that may be granted the miners of the Southern Appalachian Coal Operators' Association.

"It is mutually agreed by the parties hereto that the custom heretofore and now in effect with reference to pulling man trip shall be continued under this agreement.

"The United Mine Workers hereby agreed that any violation of the National Labor Relations Act that may have occurred before the signing of this contract will not be initiated or prosecuted by the United Mine Workers of America.

"In Witness Whereof, each of the parties pursuant hereto have caused this agreement to be signed by the properly designated representatives on this 21st day of May, 1941."

On July 5, 1941, the conferees representing the Operators Association and the Union concluded a basic agreement known as "Southern Wage Agreement," which was made effective as of April 1, 1941, and to continue in effect until March 31, 1943. This agreement established certain basic conditions of employment, rates of pay and hours of work. It made provisions for "District Agreements" dealing with local conditions in each district, not inconsistent with the basic rates of pay, hours of work, conditions of employment and the specific rights and obligations of operators and mine workers set forth in the basic contract. It also contained a "Protective Wage Clause" providing, in substance, that all parties to the basic agreement should receive and have the benefit of any more favorable terms covering wages or working conditions which might be embodied in any District Agreement.

On November 5, 1941, a so-called "District Agreement" applying to District 19 was finally concluded and executed. It,

like the basic contract, was made effective from April 1, 1941, to March 31, 1943. This District Agreement provided that engineers (the classification to which it is admitted the plaintiff Maynard Cox belonged) should be paid wages at the hourly rate of $1.023 for regular time and firemen (the classification to which it is admitted the plaintiff Ora L. Jones belonged) should be paid an hourly rate of $.857 for regular time. A day of eight hours or forty hours per week was fixed as regular time. For time worked in excess thereof, the plaintiffs were entitled to wages at one and one-half the regular time rate. This agreement reaffirmed the general terms of the basic contract and also contains the following provisions:

"It is understood and agreed by and between the parties hereto that if the United Mine Workers of America negotiate a wage agreement covering variations in working conditions with any other person, company, association or district on a basis 'more favorable to such other person, company, association or district than the basis of this present wage agreement, then in that event the basis of this present wage agreement shall be modified so that the Southern Appalachian Coal Operators' Association and its members shall receive all the benefits of such more favorable wage agreement unless such agreement has been approved by the Southern Appalachian Coal Operators' Association (pages 1–2).

\*     \*     \*     \*     \*     \*     \*

"No deviation from the rates of pay set out in this contract shall be permitted" (page 35).

Notwithstanding the provision of the temporary agreement between the defendant and the representatives of its employees of May 21st previous, that "the undersigned coal company agrees to accept the agreement by and between District 19, United Mine Workers of America and the Southern Appalachian Coal Operators' Association, with all its wages, hours of labor and provisions," the defendant refused to sign the District Agreement and so notified William Turnblazer, the president of District 19. Thereupon he sent Paul K. Reed, an international representative of the Union, to confer with defendant. The result of this conference was that the defendant signed the District Agreement but did so only after Paul K. Reed, purporting to act on behalf of the Union, orally agreed that the temporary contract of May 21, 1941, should continue in effect during the entire period covered

by the District Agreement, that is, until March 31, 1943. This verbal understanding was, according to the testimony of Mr. Reed, concurred in and approved by William Turnblazer, president of District 19. (Mr. Turnblazer never testified in the case; he died before the time of the trial.) It was also verbally approved by L. C. Gunter, president of the Operators' Association. There was no writing evidencing the understanding or agreement to extend the temporary agreement throughout the entire period to March 31, 1943. Mr. Gunter explains his refusal to put his consent to the agreement in writing thus:

" * * * I was asked by Mr. Turnblazer if I would put that agreement in writing and I told him no, that I didn't think it was necessary to do it, as I didn't want to publish the terms under which the Gatliff Coal Company and the United Mine Workers had made a variation in this contract, as it might establish a precedent in the district which would be troublesome, and that therefore I would not do that but that we would make a gentlemen's agreement to that effect, that he would have to accept my word and my promise that there would be no difficulty on the part of the Association."

It appears from the testimony however that the defendant paid Clarence Lawson, an employee engaged as engineer in its power plant at the wage rate provided by the District Agreement and also paid other employees who, from time to time, were substituted for plaintiffs, in their absence, at the rate fixed by the District Agreement, but did not at any time pay the plaintiffs the wage rate so provided. Soon after the ratification of the District Agreement and at frequent intervals thereafter, plaintiffs in person and through their representatives on the local mine committee, protested the failure of defendant to pay them the full amount provided by the District Agreement and at all times insisted that they were entitled to the wage therein provided although they accepted semi-monthly payments at a less rate.

According to a transcript from defendant's books filed in the record which, pursuant to an order made at pre-trial conference, is accepted by the parties as correct, at the hourly rate for regular time and overtime as provided in the District Agreement, the plaintiff Maynard Cox earned a total of $4285.35 for regular time and a total of $5862.17 for overtime, for which defendant paid him only $1597.43 on account of regular time and $2181.63 on account of overtime.

According to the same records, at the hourly rate for regular time and overtime, as provided in the District Agreement, the plaintiff Ora L. Jones earned a total of $2245.34 for regular time and a total of $2389.39 for overtime, for which defendant paid him only $1048.89 on account of regular time and $1105.33 on account of overtime.

The payments so made to the plaintiffs, while substantially below the rates provided by the District Agreement, were more than the minimum rates required by Section 6 of the Fair Labor Standards Act [29 U.S.C.A. § 206] for regular time and included one and one-half thereof for overtime.

The plaintiffs seek judgment for the balances due them, respectively, under the terms of the District Agreement and, under Section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b), they seek "liquidated damages" and reasonable attorneys' fees.

The defendant, denying any liability to plaintiffs, relies upon the oral agreement made with Union representative, Paul K. Reed, to the effect that the writings of March 21, 1941, should be effective until March 31, 1943. It contends that as these plaintiffs were "employees doing work in the said power house" they were limited to the wages provided in the agreement of May 21st, the full amount of which has been paid them. Defendant also pleads that, by accepting those wage rates during the entire periods of their respective employments, the plaintiffs are now estopped to claim wages under the District Agreement.

Plaintiffs insist that, since defendant makes no allegations of fraud or mutual mistake, under the familiar rule commonly known as the "parol evidence rule," all parol testimony herein introduced and relied upon by defendant as to negotiations tending to substitute a prior or contemporaneous parol agreement at variance with the written agreement which was admittedly executed by the parties, is incompetent and should be disregarded. They also challenge the authority of the officers of the Union, no express authority being shown, to abrogate, waive or modify the terms of the District Agreement in such a way as to discriminate against them. Piercy v. Louisville & N. R. Co., 198 Ky. 477, 248 S.W. 1042, 33 A.L.R. 322; Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226.

While fully agreeing with these contentions it seems preferable to rest the decision of this case upon broader and less tenuous grounds.

**56**

are of the opinion that upon the grounds and for the reasons set forth in the findings and the opinion, the judgment appealed from should be and the same is therefore affirmed.

■ During the period involved in this litigation, the rights and duties of the parties as employer and employees were subject to the provisions of the "National Labor Relations Act" (29 U.S. C.A. §§ 151–166) and the "Fair Labor Standards Act of 1938" (29 U.S.C.A. §§ 201–219), and in so far as these Acts of Congress are pertinent to the issues here involved they are controlling.

The so-called "District Agreement" was a valid collective bargaining agreement within the meaning of the National Labor Relations Act and is entitled to the protection which it affords.

■ In utilizing collective bargaining agreements to implement a National labor policy designed to remove certain recognized sources of industrial strife by encouraging friendly adjustment of industrial disputes as to wages, hours of work and other conditions of employment, upon a plane of equality of bargaining power between employers and employees, the National Labor Relations Act, in the public interest, has given such collective bargaining agreements a more secure and stable position in our National economy than that of ordinary common law contracts which may be altered at pleasure by rendering ineffectual and unavailable any collateral agreements between individual members of the collective bargaining group designed to obtain a diminution of the obligations of a particular employer or abridgment of the benefits accruing to particular employees under the collective agreement, regardless of the circumstances that may be relied upon to justify them or the terms thereof. To hold otherwise "* * * would reduce the National Labor Relations Act to a mere futility and leave collective agreements no stronger than the weakest members of the union." J. I. Case Co. v. National Labor Relations Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762. Statutes requiring collective bargaining would have little substance if what was made collectively could be promptly unmade individually. Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 346, 64 S.Ct. 582, 88 L.Ed. 788.

■ The Act also contemplates that a collective bargaining agreement be in writing. In H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 525, 61 S.Ct. 320, 324, 85 L.Ed. 309, after commenting upon the history of the collective bargaining process and pointing out that its object "has long been an agreement between employer and employees * * * evidenced by a signed contract or statement in writing," the Supreme Court said:

"We think that Congress, in thus incorporating in the new legislation the collective bargaining requirement of the earlier statutes included as a part of it, the signed agreement long recognized under the earlier acts as the final step in the bargaining process."

■ It thus appears that the National Labor Relations Act clearly precludes defendant's reliance upon the prior or contemporaneous oral agreement upon which its defense to these actions is based.

■ I am of the opinion that the wages, hours of work and conditions of employment of both plaintiffs, during the period of their respective employments by defendant here involved, were governed by the written collective bargaining agreements, which defendant signed, and that by accepting semi-monthly payments of less amount than the wages provided by the written collective agreement, they are not estopped to claim the balance due them thereunder, but are entitled to judgment for such balance.

Under the provisions of Section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b), each of the plaintiffs is entitled to judgment against defendant for "an additional equal amount" of his "unpaid overtime compensation" as "liquidated damages," Bumpus v. Continental Baking Co., 6 Cir., 124 F.2d 549, 553, 140 A.L.R. 1258, and their attorneys are entitled to allowance of "a reasonable attorney's fee," to be paid by defendant, for services rendered in respect to the issues arising out of and the results attributable to the Fair Labor Standards Act.

Detailed findings of fact and conclusions of law are attached hereto and judgment will be entered accordingly.

H. Church Ford,
Judge.