[No. 32389. Department Two. February 19, 1954.]

M. D. McDONALD, *Respondent,* v. EUGENE R. WOCKNER *et al.,*
*Appellants.*[1]

[1]Reported in 267 P. (2d) 97.

*Pomeroy, Yothers, Luckerath & Dore,* for appellants.

*Bassett, Geisness & Vance,* for respondent.

DONWORTH, J.—This action was brought by an employee to recover from his former employer the amount of wages allegedly rebated to the latter in violation of chapter 195, Laws of 1939, p. 648, as amended by chapter 72, Laws of 1941, p. 187 [*cf.* RCW 49.52.050 and 49.52.070], colloquially known as the "Anti-Kickback" statute.

The period involved in the controversy began in December, 1946, and ended in July, 1948. During this time, plaintiff

was employed by defendant husband as a salesman in his automobile sales agency. The answer, besides denying that plaintiff had paid back any portion of his wages or commissions to the defendant employer, contained two affirmative defenses: first, that the action was barred by the statute of limitations; and second, that the labor union (of which plaintiff was a member) was the real party in interest and that there was another action pending between the defendants and the union involving the same subject matter.

A trial to the court sitting without a jury resulted in findings and a judgment for plaintiff in the sum of $3,990.84. Defendants' motion for a new trial was denied, and they have appealed.

In this opinion, Eugene R. Wockner will be referred to as though he were the sole appellant.

The testimony bearing upon the principal issue of fact involved in this case, to wit, whether respondent actually paid back to appellant any portion of his wages or commissions, is in direct conflict. The only witnesses who testified on this issue were the two parties to this suit.

Respondent testified that, shortly after receiving his commissions each month, he would go into appellant's private office, where, with the blinds down, he would pay appellant in cash the amount by which his commissions exceeded the sum of three hundred fifty dollars.

Appellant denied that he ever received any money from respondent, except payments on a mortgage on respondent's home, to which further reference is made later in this opinion. Appellant even denied that there were any blinds on his office windows.

The trial court took the case under advisement for two days and then orally announced its decision in favor of respondent upon this vital issue of fact, thus passing upon the relative credibility of the two parties. Later, the court entered its findings accordingly.

The evidence relating to other matters was not in serious dispute and may be briefly stated as follows:

Appellant for seventeen years prior to the trial had been engaged in the business of selling new and used automobiles

in Seattle. In December, 1946, he was a member of the Seattle Automobile Dealers' Association (herein called the association), which had a collective bargaining contract with the Automobile Drivers and Demonstrators Local 882 (herein called the union), of which respondent was a member.

This contract, which prescribed the commissions payable to union salesmen for sales of automobiles, became effective as of April 1, 1946, for a period of one year and was automatically renewed each year, unless either party thereto should give a written notice to the contrary to the other party thirty days prior to the anniversary date. No such notice was given during the years material to this case.

Appellant contends that he ceased to be a member of the association on December 31, 1947, because he paid no dues thereafter. He never notified either the association or the union that he had given up his membership and the records of the association show that he was a member until at least March 30, 1948. The trial court found that appellant was bound by this contract until May 6, 1948.

Shortly before that date, the union learned that appellant claimed that he was no longer bound by the association's contract, and its agent approached him for the purpose of getting him to sign a separate contract directly with the union. Consequently, appellant on May 6, 1948, executed a contract with the union which contained the same provisions regarding commissions as were provided for in the contract with the association.

Respondent had previously been employed by appellant in 1940 and 1941. In the fall of 1946, respondent was living in Bremerton, where he was employed in defense work. He came to Seattle about December 1, 1946, and applied to respondent for re-employment as a salesman. He was hired and began working December 3rd.

A few weeks later (according to respondent's testimony), appellant suggested to him that if the latter would accept a flat salary of three hundred fifty dollars per month in lieu of regular commissions on the sales he made, he could be

assured of continuous employment as long as appellant remained in business. Respondent accepted this arrangement because, as he testified, he needed employment at that time, and because appellant had given him, without cost, a home in Seattle. The circumstances surrounding this gift are hereinafter described.

During the eighteen months involved in this case, respondent received commissions totaling $13,493.34, on which he paid an income tax and from which deductions were made for social security and similar items. The total amount of these commissions which the court found to have been rebated to appellant was $7,090.84.

The transaction regarding the gift of the home to respondent is quite unusual, but, since it is claimed by respondent to have been a factor in his orally agreeing with appellant to accept the salary of three hundred fifty dollars per month in lieu of commissions, we must refer to it in some detail.

When respondent was first employed by appellant in December, 1946, he was living in a rented house in Bremerton. He discussed with appellant the difficulty he was experiencing in finding a suitable home in Seattle. Appellant saw a newspaper advertisement wherein a house was offered for sale for $8,500. He called this advertisement to respondent's attention, and suggested that respondent look at the house. After doing so, respondent reported that it had possibilities. Appellant gave respondent currency with which to make an offer to buy the house for cash.

The testimony differs slightly as to the amount of currency. Appellant said it was $6,500; respondent said it was $6,000. The court accepted appellant's testimony and made a finding that it was the higher figure.

There is no dispute that the currency furnished by appellant was paid by respondent to the seller of the house, and that, with appellant's approval, the property was deeded to respondent January 3, 1947, and that he has occupied the premises as his home at all times since.

In November, 1948, appellant asked respondent to quit-

claim the property to him. Respondent declined, claiming that he had spent approximately $2,500 in improvements. He offered to purchase the property from appellant. Respondent finally gave a mortgage on the property to appellant's wife to secure his note for $5,900.

At this point there is another slight discrepancy in the testimony of the parties, each one testifying contrary to his own financial interest. Respondent contended that up to the time of the execution of the mortgage no payments were made by him to appellant in connection with the house. Appellant claimed, and the trial court so found, that respondent had at that time made payments aggregating $3,100, leaving a balance of $3,400 due on the original purchase price of the property.

The trial court in computing the amount of the unlawful rebates deducted therefrom the sum of $3,100, which reduced the amount thereof to $3,990.84 (the amount of the judgment).

Later, after a dispute arose with appellant regarding the receipt by him of certain payments made on the mortgage, respondent obtained an FHA mortgage on the property and paid off appellant's wife's mortgage in full.

Appellant makes ten assignments of error, which we discuss in the order in which they are treated in his brief.

The first assignment is directed to the portion of finding of fact No. 2 wherein the court found that respondent was employed by appellant pursuant to the two collective bargaining contracts hereinbefore described. It is argued that respondent's own testimony is to the effect that he entered into a negotiated agreement to work for appellant as long as he was in business for a salary of three hundred fifty dollars per month (regardless of whether he sold any cars or not) plus the gift of the home.

It is undisputed that, at all times during the period of employment, appellant paid respondent in full the commissions provided for in these collective bargaining contracts. He is hardly in a position now to contend to the contrary. Furthermore, the arrangement regarding the

salary of three hundred fifty dollars per month was not made until after respondent had been employed for several weeks. On cross-examination, respondent testified: "When I first went to work . . . there was no agreement. I was on the regular Union basis." There was no contradiction of this statement.

The second assignment attacks finding No. 3, wherein the court found that the association had authority to negotiate and enter into collective bargaining contracts on behalf of its members and that appellant was bound by the existing contract until May 6, 1948. This assignment is without merit for the reasons hereinafter stated in connection with our discussion of appellant's ninth assignment of error.

The next assignment relates to finding No. 4, in which the court found that the oral agreement was made between the parties to pay and accept a salary of three hundred fifty dollars per month in lieu of the commissions provided for in the collective bargaining contract between the association and the union.

This assignment and the following assignment, which challenges finding No. 6 (in which the court found that respondent actually paid back to appellant all commissions in excess of three hundred fifty dollars per month), constitute an attack on the trial court's decision as to the relative credibility of the parties regarding the pivotal issue in the case.

The court in its oral decision discussed this matter at length. After stating that respondent's bank statements and similar documents were of little assistance in deciding this issue, the trial judge concluded:

"So I go back to where I started very largely and have to resort to those tests for weighing the credibility of a witness that we lay down for juries in every jury case we try: The demeanor of the witness upon the stand, the reasonableness or unreasonableness of the story he relates, interests, etc. When I do that, I come to the conclusion that I cannot accept the story in full of either one of the parties.

"Of the two, I think Mr. McDonald was the more credible witness. He had a greater air of frankness. His story seemed to me to have a greater ring of truth in many aspects

than the story of Mr. Wockner. When there was an item he could not explain, he frankly would say he could not explain it. And I might say that I have scrutinized his story with a rather jaundiced eye. I cannot have too much sympathy for a man, assuming that he is telling the truth, who double-crosses his Union, then makes a deal with his employer and double-crosses him by going back on it, even though it was an illegal transaction. He had a degree of culpability.

"But it is not my function to give moral lectures. It is my function to decide this as a matter of law and where the proof lies.

"I am going to find as a fact that there was such an agreement between them and that some of these wages were rebated."

 In the present case, the trial judge was appraising the relative credibility of the parties in the light of his experience of more than twenty-eight years on the bench. As we said in *In re Martinson's Estate*, 29 Wn. (2d) 912, 190 P. (2d) 96:

"A trial judge is much more than a commissioner named to take and collect evidence in a case. He is a judicial officer provided for by our constitution, and the laws of this state. He has had years of experience as a trial lawyer, and as a judge. . . . The credibility of the witnesses, and the force of their testimony, and the weight that should be attached to it, are all matters concerning which the trial judge is the best judge."

What was said in *Lalley v. Lalley*, 43 Wn. (2d) 192, 260 P. (2d) 905, under somewhat similar circumstances is applicable to this case. We there said:

"Appellant and respondent were the only witnesses. Two theories were presented. The trial court, as the trier of the facts, rejected one and accepted the other. The record does not disclose that the evidence preponderates against the findings of fact. *Peterson v. Schoonover*, 42 Wn. (2d) 621, 257 P. (2d) 209."

See, also, *Corbett v. Ticktin*, 43 Wn. (2d) 248, 260 P. (2d) 895.

 From our examination of the record we cannot say that the evidence in this case preponderates against any

of the findings of fact which appellant has claimed to be erroneous. Therefore, under our well settled rule the findings as made will be accepted as verities.

We now turn to a consideration of certain legal questions which are raised by the remaining assignments of error.

The fifth assignment of error is directed to finding No. 7, in which the court found that sums remitted by respondent totaling $3,990.84 constituted an unlawful rebate of wages.

Since we have accepted the findings of fact above referred to, the only issue raised by this assignment is the legal question whether the contract between the association and the union was such a contract as would fall within the terms of the so-called "Anti-Kickback" statute, RCW 49.52.050.

That statute, originally passed by the legislature in 1939, has been construed in but one case, *State v. Carter*, 18 Wn. (2d) 590, 140 P. (2d) 298, 142 P. (2d) 403. In that case, this court construed the statute as to public officers and held that the act did not prohibit voluntary contributions by an employee to his employer or in his employer's behalf, which were made after the employee had received the wage or salary due him. There is no contention in this case that any voluntary contributions were given by respondent to appellant because appellant denied that any sum whatever had been rebated.

"Anti-Kickback" statutes have been enacted by Congress and the legislatures of sixteen states, including Washington. The states in which such statutes are in effect are Arizona, California, Connecticut, Illinois, Kentucky, Maine, Michigan, Minnesota, Montana, Nevada, New Hampshire, New York, Ohio, Vermont, Virginia, and Washington.

Decisions interpreting similar statutes are found in New York and California, in addition to the Federal cases. In New York the statute has been declared a part of the public policy of the state. In *McNeill v. Hacker*, 21 N. Y. S. (2d) 432, the court said:

"In effect, whenever an agreement between a labor union and an employer requires that workmen shall be paid an agreed wage, it is now unlawful for any person to request, demand, or receive back any part or all of such workmen's

wages upon the representation or understanding that failure to comply will prevent them from procuring or retaining employment. While the Court makes no determination as to whether or not the facts in the case at bar constitute a violation of the Penal Code, nevertheless it is of the opinion that the oral subsequent agreement between the employer and the employee even though executed cannot be held to have modified the terms and provisions of the written contract made between the employer and the union, in the absence of the union's consent to such attempted modification. *Any other holding would be contrary to the rules of contract law and in derogation of the public policy of this State as regards labor contracts.*" (Italics ours.)

In California, also, the "Anti-Kickback" statute, a part of the California Labor Code, has been declared the public policy of the state. *Sublett v. Henry's Turk & Taylor Lunch,* 21 Cal. (2d) 273, 131 P. (2d) 369. See, also, 149 A. L. R. 495.

Chapter 72, Laws of 1941, p. 187 [*cf.* RCW 49.52.050], the so-called "Anti-Kickback" statute, in so far as it applies to this case, reads as follows:

"Section 1. Any employer or officer, vice-principal or agent of any employer, whether said employer be in private business or an elected public official, who

" (1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; or

" (2) Wilfully and with intent to deprive the employee of any part of his wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract. . . .

"Shall be guilty of a misdemeanor."

Though this statute is not in the identical language of either the New York or the California "Anti-Kickback" statutes, it seems clear that the mischief sought to be remedied by the passage of our statute is the same as that which impelled those two states to enact their statutes. Consequently, we hold that the above-quoted "Anti-Kickback" statute does declare the public policy of this state on the matter of secret rebates of wages by an employee to an employer.

There is an analogy between the public policy of this state

in forbidding secret rebates of wages by an employee and its public policy in forbidding an employer to interfere with his employees in their selection of a collective bargaining agent. In *Building Service Employees International Union Local 262 v. Gazzam,* 339 U. S. 532, 94 L. Ed. 1045, 70 S. Ct. 784, the United States supreme court has recognized the public policy of this state relative to employees' rights in respect to organizing for bargaining purposes, saying:

"The State of Washington has by legislative enactment declared its public policy on the subject of organization of workers for bargaining purposes. . . . Under the so-enunciated public policy of Washington, it is clear that workers shall be free to join or not to join a union, and that they shall be free from the coercion, interference, or restraint of *employers of labor* in the designation of their representatives for collective bargaining."

It would seem that the state should be, and apparently is, as much concerned with preventing employers from coercing employees into making secret rebates from their wages as with preventing employers from coercing their employees in their right to organize for collective bargaining purposes.

In both California and New York, collective bargaining contracts between a union and an employer have been held to be such contracts as will be protected by the operation of "Anti-Kickback" statutes. *McNeill v. Hacker, supra,* and *Sublett v. Henry's Turk & Taylor Lunch, supra.*

█ Applying the same reasoning in this case, we hold that the union contract negotiated by the association in behalf of appellant and the contract signed directly by appellant with the union are contracts which fall within the terms of the "Anti-Kickback" statute (RCW 49.52.050).

In holding that RCW 49.52.050 enunciates the public policy of the state and in ruling that collective bargaining contracts are such contracts as will be protected by the statute, we have not overlooked *Clark v. Claremont Apartment Hotel Co.,* 19 Wn. (2d) 115, 141 P. (2d) 403, 153 A. L. R. 50; *Herman v. Golden Arrow Dairy,* 191 Wash. 582, 71 P. (2d) 581; nor *Huston v. Washington Wood & Coal Co.,* 4 Wn. (2d) 449, 103 P. (2d) 1095, upon which appellant relies.

In *Clark v. Claremont Apartment Hotel Co., supra,* the union agreed that the employer might pay less than the union scale to one employee, Clark. The employee was estopped by the union's oral contract from recovering in his suit to collect the difference between what he was paid and the union scale because, by the terms of the contract, the employee had been paid in full. The case thus is distinguishable on its facts from the case at bar.

*Herman v. Golden Arrow Dairy, supra,* was decided before RCW 49.52.050 was enacted, and *Huston v. Washington Wood & Coal Co., supra,* was concerned with wage rebates allegedly made at a time before RCW 49.52.050 was enacted. Neither can be relied upon as authority now in the face of the statute definitely establishing the public policy of the state in the matter of wage rebates.

■ Our holding on the preceding assignment of error also furnishes the basis for a disposition of appellant's contention that he was not bound by the contract negotiated between the association and the union because it was superseded by the later secret agreement between appellant and respondent setting respondent's wages at three hundred fifty dollars per month. As this court said in *Motor Contract Co. v. Van Der Volgen,* 162 Wash. 449, 298 Pac. 705, 79 A. L. R. 29:

"While, generally, parties may waive their contractual or statutory rights by an agreement to waive, yet an agreement to waive rights involving a question of public policy is void."

From what we have said herein, it follows that respondent could not waive his rights under the contract between the union and the association, and appellant was bound by the contract, since respondent's agreement to waive his rights under the written contract was void.

The sixth assignment of error (in which appellant asserts the court erred in that the conclusions of law and judgment are not supported by the findings of fact) and the seventh assignment (in which he claims that the findings are not supported by the preponderance of credible evidence) have

been disposed of by what we already have said concerning prior assignments of error.

The eighth assignment (which is directed to conclusion of law II in so far as the court concluded therein that respondent was entitled to judgment against appellant in the sum of $3,990.84) likewise has been disposed of by our discussion of the fifth assignment.

In the ninth assignment, appellant complains that the court erred in denying his motion to strike that portion of the complaint in which respondent sought to recover rebates alleged to have been made in January, February, March, and April of 1948.

This assignment is based on appellant's testimony that he was not a member of the Auto Dealers' Association after December, 1947, because he had not paid his dues subsequent to that date. Appellant conceded that he was a member of the association when the collective bargaining contract between the union and the association was signed May 31, 1946. The contract provided it would be renewed automatically each successive April 1, unless the association or the union served a thirty-day written notice upon the other of a desire to reopen the contract.

Article 1, section 5, of the by-laws of the association provides that "Any member may at any time withdraw upon surrendering his membership certificates and paying the amount of his dues and indebtedness to the Association."

There is no evidence to show that appellant ever complied with this requirement. Nor is there any evidence that appellant ever notified the union that he had withdrawn from the association and claimed to be no longer bound by the contract.

Under the terms of article 1, section 5 of the by-laws of the association, appellant remained a member of the association during January, February, and March, 1948. The collective bargaining contract between the association and the union was in effect during this period.

On March 30, 1948, the association wrote appellant a letter notifying him he would be dropped as a member if his

delinquent dues were not paid by April 10, 1948. The association's carbon copy of this letter to appellant contains a handwritten notation: "Telephoned reply. Asks to be dropped from Assn. Does not agree with labor policy." There is no testimony to indicate when the phone call referred to was received or when appellant's name was dropped from the association's rolls.

Assuming that appellant was dropped from the association's rolls on March 31 or April 1, 1948, however, there is no dispute that he did not notify the union that he claimed not to be bound by the contract. The union, about May 1, 1948, ascertained from another source that appellant claimed not to be bound by the association's collective bargaining agreement. Upon learning this fact, the union promptly procured his signature to a new contract binding appellant to pay his employees the identical compensation provided for in the contract between the association and the union.

The general rule applicable to this situation is well stated in 2 Am. Jur. 42, Agency, § 44:

"So far as third persons are concerned, the principal, as a rule, may revoke the authority of his agent at any time, but the acts of an agent after his authority has been revoked may bind a principal as against third persons who, in the absence of notice of the revocation of the agent's authority, rely upon its continued existence. The general rule is that the acts of an agent, within the apparent scope of his authority, are binding on the principal as against one who had formerly dealt with him through the agent and who had no notice of the revocation. This is especially so with reference to transactions initiated by the agent before the revocation of his authority."

Consequently, it must be held that, in the absence of notice to the union, appellant was bound by the act of the association in allowing the contract to be extended for another year on April 1, 1948. That being the case, appellant continued to be bound by the first contract until May 6, 1948, when appellant signed the second contract directly with the union.

The trial court did not err in denying appellant's motion

to strike the portion of the complaint alleging rebates were made in January, February, March and April, 1948.

The last assignment of error charges that the court erred in refusing to grant appellant's challenge to the sufficiency of the evidence and motion to dismiss at the close of respondent's case and at the close of the entire case.

[8] Since appellant presented evidence on his own behalf, he thereby waived his motion to dismiss at the close of respondent's case. *Minch v. Local Union No. 370, International Union of Operating Engineers, ante* p. 15, 265 P. (2d) 286. *Sevener v. Northwest Tractor & Equipment Corp.,* 41 Wn. (2d) 1, 247 P. (2d) 237.

The question of the sufficiency of the evidence at the close of the case has been covered by what we already have said in this opinion, except appellant's claim that the action is barred by the statute of limitations. Appellant alleged by an affirmative defense that either the two-year or the three-year statute of limitations was applicable to respondent's cause of action.

If either the two-year or three-year statute applies, the trial court should have granted appellant's motion to dismiss, since the action was not commenced until November 27, 1951, more than three years after respondent made the last rebate of wages to appellant in July, 1948, according to respondent's own testimony.

Respondent urges that the six-year statute of limitations (RCW 4.16.040) applies.

The two-year statute (RCW 4.16.130) does not apply to actions arising from a contract or a statute. Since this action is based either on the collective bargaining contracts or upon the "Anti-Kickback" statute, it is not governed by the two-year statute.

The three-year statute (RCW 4.16.080) includes:

"(3) An action upon a contract or liability express or implied, which is not in writing, and does not arise out of any written instrument; . . .

"(6) . . . an action upon a statute for penalty or forfeiture, where an action is given to the party aggrieved, or to such party and the state, except when the statute imposing it prescribed a different limitation."

The six-year statute (RCW 4.16.040) applies to the following: .

"(2) An action upon a contract in writing, or liability express or implied arising out of a written agreement."

Since respondent's compensation was fixed by the two written contracts and not by the oral agreement between appellant and respondent, subsection (3) of RCW 4.16.080 cannot apply.

*Gensman v. West Coast Power Co.*, 3 Wn. (2d) 404, 101 P. (2d) 316, cited by appellant as authority for applying the three-year statute, is based upon an oral contract, and this case is based upon written contracts. Consequently, the *Gensman* case is not controlling here.

Appellant contends that the cause of action arises from the "Anti-Kickback" statute and thus is governed by subsection (6) of RCW 4.16.080.

The "Anti-Kickback" statute makes void the oral agreement between the parties whereby each agreed that the actual compensation should be three hundred fifty dollars per month. The same statute, in subsection (2), forbids the payment by an employer of a lower wage than he is obligated to pay "by . . . *contract*." (Italics ours.)

Therefore, this action is upon a written contract—in fact, two collective bargaining contracts consecutively in effect —prescribing the wages which appellant was obligated to pay respondent. The object of this action is to recover the full amount of compensation provided for therein. Appellant's liability arises expressly out of written agreements.

Since the action is based upon the written contracts, the six-year statute must be held to apply. The trial court did not err in refusing to grant appellant's motion to dismiss.

Accepting the trial court's findings as the facts in the case, the applicable legal principles sustain the judgment.

Consequently, the judgment is affirmed.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.

April 9, 1954. Petition for rehearing denied.