[No. 45051. En Banc. June 8, 1978.]

RESTAURANT EMPLOYEES, BARTENDERS AND HOTEL
SERVICE EMPLOYEES WELFARE FUND, ET AL,
*Appellants,* v. MORRIS RHODES,
ET AL, *Respondents.*

*Robert A. Bohrer* and *Donaldson & Kiel, P.S.,* for appellant.

*Oseran, Hahn, Nelson, Lucas & Kelley, P.S.,* by *Gerald M. Hahn* and *E. Allen John, Jr.,* for respondents.

ROSELLINI, J.—This is a suit to recover payments allegedly owing to joint health and welfare and pension trusts, pursuant to a collective bargaining contract. The agreement was signed by the defendant husband, on behalf of the marital community which operated a restaurant called Clare's Pantry.

The contract incorporated by reference a "master agreement" between the union and a Seattle restaurant association. The master agreement provided that employers would require all of their employees to join the union within 30 days,[1] and further provided that monthly payments should be made to the health and welfare and pension trusts on behalf of all employees.

---

[1] Federal law permits such provisions:

"(a) It shall be an unfair labor practice for an employer—

". . .

."(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective–bargaining unit covered by such agreement when made; and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (b) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the

According to the stipulated facts, a union agent represented to the employers, before the execution of the contract, that they were not required to make payments on behalf of employees who were not union members, and they relied in part on this statement. The contract was signed in August 1972. Each month thereafter and until its expiration date, the employers submitted monthly report forms to the trusts, which forms called for the reporting of all employees. The employers paid contributions only for those who were union members. The stipulated facts do not disclose whether they made any attempt to comply with the provision in the master agreement whereby they undertook to require their employees to join the union.

On October 30, 1974, the trustees caused an audit to be made of the payroll records of the employers, which revealed that welfare and pension contributions had not been made on behalf of a number of employees. This suit was instituted to recover the delinquent payments. The union is not a party.

The employers offered several theories of nonliability, all of which were rejected by the Superior Court save for a contention that Rhodes signed the contract laboring under a mistake as to its terms. Although the employers' theory had been that there was a mutual mistake of fact, the court found that it was a unilateral mistake induced by the union agent. It concluded that as a result of it no contract had been formed. However, the court refused to order a refund of the payments made on behalf of the union employees, holding in effect that there had been a contract "established by conduct" to make such contributions.

Both parties have appealed. The trustees complain of inferences which the trial court drew from the stipulated facts, namely, that Rhodes did not know and the union agent did know that the master agreement required employer contributions for nonunion employees, that the

failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;" 29 U.S.C. § 158(a)(3).

employers never assented to a requirement that they make payments on behalf of all employees, and that the union agent knew this. It is their contention that the stipulated facts do not support such inferences or the conclusions which the court based on them.

■ There is merit in this contention. The stipulated facts show that the trusts were created pursuant to section 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186 (c)(5). Under that statute, a trust fund agreement is invalid unless it is in writing. That there was a written agreement here and that it required that payments be made on behalf of all employees are undisputed. The actions of the employers in submitting monthly report forms and payments on behalf of some employees was consistent with the existence of a written agreement requiring such payments. There is a strong federal labor policy, which favors written labor contracts (29 U.S.C. 158(d), *H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 85 L. Ed. 309, 61 S. Ct. 320 (1941)) and also favors their enforcement. *Trust Fund Servs. v. Heyman*, 88 Wn.2d 698, 565 P.2d 805 (1977).

There is also a strong federal policy favoring the protection of trust funds, provided they are maintained according to the federal law, because of the fact that employees are presumed to have worked in reliance upon them and upon the availability of their benefits. *Lewis v. Seanor Coal Co.,* 256 F. Supp. 456 (W.D. Pa. 1966), *aff'd,* 382 F.2d 437 (3d Cir. 1967), *cert. denied,* 390 U.S. 947 (1968).

In fashioning the body of federal law to facilitate the enforcement of such contracts, the courts have said that common–law contract principles do not govern, where they conflict with federal labor policy.[2] *Gatliff Coal Co. v. Cox,* 152 F.2d 52 (6th Cir. 1945); *NLRB v. George E. Light Boat Storage, Inc.,* 373 F.2d 762 (5th Cir. 1967); *Schlecht v. Walsh,* 429 U.S. 401, 50 L. Ed. 2d 641, 97 S. Ct. 679 (1977).

---

[2]The employers cite the case of *Barclay v. Spokane,* 83 Wn.2d 698, 521 P.2d 937 (1974), for the proposition that collective bargaining agreements are governed by the ordinary rules of contract law. That case, however, did not involve a question of federal labor law.

In *Gatliff Coal Co. v. Cox, supra* at 56 n.1, which involved a claim by employees for overtime pay under the terms of a written collective bargaining agreement with an employer who resisted the suit on grounds he had an oral agreement with the union business agent that the written agreement would not be enforced, the Sixth Circuit Court of Appeals (adopting verbatim the district court's opinion) said:

.In utilizing collective bargaining agreements to implement a National labor policy designed to remove certain recognized sources of industrial strife by encouraging friendly adjustment of industrial disputes as to wages, hours of work and other conditions of employment, upon a plane of equality of bargaining power between employers and employees, the National Labor Relations Act, in the public interest, has given such collective bargaining agreements a more secure and stable position in our National economy than that of ordinary common law contracts which may be altered at pleasure[,] by rendering ineffectual and unavailable any collateral agreements between individual members of the collective bargaining group designed to obtain a diminution of the obligations of a particular employer or abridgment of the benefits accruing to particular employees under the collective agreement, regardless of the circumstances that may be relied upon to justify them or the terms thereof. To hold otherwise "* * * would reduce the National Labor Relations Act to a mere futility and leave collective agreements no stronger than the weakest members of the union." . . .

The Act also contemplates that a collective bargaining agreement be in writing. In H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 525, 61 S.Ct. 320, 324, 85 L.Ed. 309 [1941], after commenting upon the history of the collective bargaining process and pointing out that its object "has long been an agreement between employer and employees * * * evidenced by a signed contract or statement in writing," the Supreme Court said:

"We think that Congress, in thus incorporating in the new legislation the collective bargaining requirement of the earlier statutes included as a part of it, the signed

agreement long recognized under the earlier acts as the final step in the bargaining process."

It thus appears that the National Labor Relations Act clearly precludes defendant's reliance upon the prior or contemporaneous oral agreement upon which its defense to these actions is based.

That misrepresentations, whether innocent or fraudulent, cannot be relied upon to alter the obligations of a written collective bargaining contract is established in the following cases, in all of which recovery of contributions required under collective bargaining agreements was sought by third party beneficiary trustees: *Lewis v. Mearns,* 168 F. Supp. 134 (N.D. W. Va. 1958), *aff'd,* 268 F.2d 427 (4th Cir. 1959) (employer claiming that a collective bargaining contract was void for fraud and misrepresentation of business agent); *Lewis v. Young & Perkins Coal Co.,* 190 F. Supp. 838 (W.D. Ky. 1960) (employer relying on a promise of a business agent which was inconsistent with the written terms of the contract); *Lewis v. Gilchrist,* 198 F. Supp. 239 (N.D. Ala. 1961) (employer contending that labor agreement was merely a sham to create the appearance of a labor agreement); *Lewis v. Harcliff Coal Co.,* 237 F. Supp. 6 (W.D. Pa. 1965) (employer relying on oral statement at odds with the terms of the contract); *Local 509, ILGWU v. Annshire Garment Co.,* 65 L.R.R.M. 2769 (Kan. Dist. Ct. June 30, 1967) (employer relying on a union agent's statement that he need pay contributions for union employees only); *Pipe Trades v. England,* 69 L.R.R.M. 2379 (Cal. Super. August 30, 1968) (employer relying on oral statement by union agent which contradicted written labor agreement); *Lerwill v. Inflight Servs., Inc.,* 86 L.R.R.M. 3139 (N.D. Cal. July 24, 1974) (employer relying on oral modification); and *Pio v. Kelly,* 275 Ore. 585, 552 P.2d 1301 (1976) (employer relying on misrepresentation).

The policy which guided the courts in these decisions was explained in *Local 509, ILGWU v. Annshire Garment Co., supra* at 2772. After reciting the national labor policy which insulates collective bargaining agreements from attacks

based on alleged sham or oral side agreements contrary to their terms, the court said:

> To be sure, there are two possible evils to consider in connection with such a national labor policy. One is the overzealous or unprincipled union negotiator who will induce a management signature to a collective bargaining agreement with side assurances that management will not have to comply with certain controverted provisions. The other is management who will avoid certain obligations required by the executed collective bargaining agreement and attempt to justify such action by an alleged oral side agreement that compliance will not be required notwithstanding the clear and unambiguous requirement of the written collective bargaining agreement. To suppress industrial strife based on this type of controversy national labor policy requires that the clear and unambiguous requirements of the written collective bargaining agreement be immune from attack found on a covert side agreement.

In harmony with the philosophy expressed in these decisions, this court held in *McDonald v. Wockner,* 44 Wn.2d 261, 267 P.2d 97 (1954), a labor case involving a violation of the "Anti-Kickback" statute, RCW 49.52.050, that an agreement to waive rights, which are bestowed to effectuate a legislative policy, is void.

Here the contract in very plain language required the employers to make contributions to the trust funds each month with respect to each employee. The contract also provided that the employers should require all employees to join the union within 30 days. Confronted with such clear language, they could have believed that the contract provided otherwise only if they had failed and refused to read it and also refused to read the directions on the report forms which they submitted each month. These employers had been parties to a similar agreement immediately prior to the signing of the 1972 agreement. It appears that they had followed the same practice of paying only for those employees who belonged to the union, contrary to the requirements of that contract.

■ As we read the cases which have developed the federal law with respect to the enforcement of written collective bargaining agreements, they impose a duty upon the parties to such agreements to read and understand them. Certainly the policy which these cases express does not permit an employer to rely upon the assurances of another party as to their terms, as long as he is not denied access to the written agreement.

Here the master agreement was not attached to the compliance contract signed by Rhodes. However, it is not denied that he was provided a copy of it and could have read it had he chosen to do so. We think it must be presumed that he did do so, if not before he signed the compliance agreement, at least within a reasonable time thereafter. If he did sign the agreement relying upon statements of the union agent, the discrepancy between that agent's reporting of the terms of the master agreement and words of the agreement itself should reasonably have inspired him to demand that the matter be clarified. But no such demand was made. Had judicial relief been sought early in the life of the contract, equitable principles might possibly have favored his cause. The contract was at that stage, at the most, voidable. But it was not void. The employers through Rhodes had signed it and they were entitled to affirm it, which they did by their subsequent conduct.

The employers chose to proceed under the contract and accept its benefits and it was not until an audit was performed more than 2 years after its inception that the contractual burdens were contested. After such a delay, a defense based upon a contention that the employers were ignorant of the terms of the contract cannot be countenanced.

In *William Dunbar Co. v. Painters & Glaziers Dist. Council 51*, 129 F. Supp. 417 (D.D.C. 1955), an employer sued to enjoin trustees of a welfare fund from collecting payments, and also to restrain the defendant union from

terminating the collective bargaining contract for nonpayment of contributions. The court found that there was a written agreement respecting the payments to the trustees, which, though it was not signed, complied with statutory requirements, and that the employer was bound by its terms. The employer endeavored to escape liability by offering evidence that an assistant United States attorney had advised one of its officers that if payments were made there might be a criminal prosecution under the Taft–Hartley Act. The District of Columbia judge held that the attorney was mistaken in his reading of the law and that the employer was not entitled to rely upon the attorney's opinion. We think the federal labor policy which dictates that a party to a labor contract cannot avoid its obligations by claiming that he relied upon the advice of an attorney regarding relevant statutory provisions closes the door to a claim that a party relied upon the representations of another party to the contract with respect to its written terms.

The judgment of the trial court here was based on its holding that, because the employers were mistaken regarding a provision of the agreement which they were signing, no contract ever came into existence. This in spite of the fact that at the time of the trial, the employers had performed under the contract throughout the entire period which it covered. The court recognized that federal labor law forbids parol testimony to vary the terms of a written collective bargaining agreement, even though misrepresentation may be involved. It evidently found support for its conclusion, however, in the case of *Lewis v. Mears,* 297 F.2d 101 (3d Cir. 1961), *cert. denied,* 369 U.S. 873, 8 L. Ed. 2d 276, 82 S. Ct. 1142 (1962).

The court in that case held that no collective bargaining agreement had been entered into, in spite of the fact that there was a signed contract, because a condition precedent had not been fulfilled. A jury found that the parties had agreed that the contract would not take effect until copies

were delivered to the employer, and the evidence justified a finding that there was no delivery.

It will be seen that the parties there had an agreement with respect to the time at which their contract would become effective, and that time never arrived. The court noted the rule that parol evidence is inadmissible to vary the terms of a written agreement but can be received to show that there was no agreement. While there was some evidence of estoppel and ratification in that case, the district judge had found that the contentions of the trustees in this regard were not established, and the appellate court refused to set the finding aside. The chief judge, dissenting, felt that the majority opinion emasculated the federal labor policy intended by Congress.

We need not decide whether that case is in harmony with the federal policy favoring enforcement of collective bargaining agreements. It is readily distinguishable. There the parties had an express agreement respecting the time at which their contract would take effect. Here there was no such agreement. There is no suggestion that the parties did not intend their contract to take effect on the date specified therein. There was no evidence of any other event or performance agreed upon as a condition precedent to the formation of the contract. There was simply an oral misrepresentation regarding one of the terms of the contract.

Another case relied upon by the employers to sustain the judgment is *Puget Sound Nat'l Bank v. Selivanoff,* 9 Wn. App. 676, 514 P.2d 175 (1973). There the Court of Appeals held that the abbreviation "sec" written after the signature of the signer of a guaranty, when read in conjunction with the contents of the document, created an ambiguity explainable by parol. The contract was not declared a nullity, but rather was modified to conform to the signer's intent. There was no finding in that case that the parties

did not intend to enter into a contract, or intended to condition their contract upon some future event or performance. We do not find it supportive of the employers' theory here.

The Superior Court's conclusion that the contract was effective with respect to union members is inconsistent with a finding that there was no contract, as the employers in their cross appeal point out. Yet the conclusion that there was a contract with respect to such members is inescapable. The payment of contributions on behalf of such employees throughout the life of the contract and the acceptance of benefits thereunder point inexorably to the existence of the written contract to which they were referable. Applying the principles of federal labor policy, the courts of this state cannot permit the employers to escape the obligations imposed under other provisions of these documents.

Our conclusion that there was a valid and subsisting written contract disposes of the employers' contention that the denial of their cross complaint for refund of contributions made on behalf of union members was inconsistent with the court's conclusion that there was no contract.

The employers also suggest that the contract provisions with respect to contributions are illegal because future benefits will not be paid to their employees, citing 29 U.S.C. § 186(c)(5), which requires that payments to a trust fund must be for the benefit of employees of the employer. The reason for this stipulated fact is not explained in the briefs. Evidently it stems from the circumstance that the contract has expired. No case cited by the employers denies to trustees the right to recover delinquent payments after expiration or termination of a collective bargaining agreement. The Superior Court did not err in rejecting this theory.

The judgment is reversed in part and remanded with directions to enter judgment for the trustees in accordance

with the terms of the written contract.

WRIGHT, C.J., and HAMILTON, STAFFORD, UTTER, BRACH-TENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.