[No. 38989. En Banc. May 22, 1969.]

PAUL T. SHEW, *Appellant,* v. COON BAY LOAFERS, INC., *et al.,*
*Respondents and Cross-appellants.**

*Black, Christensen & Nielsen,* by *Bryce Black,* for appellant.

*Reed, McClure & Moceri,* by *Hugh A. McClure,* for respondents and cross-appellants.

HILL, J.—Six good friends formed a nonprofit corporation in 1953 to hold title to certain property which they were purchasing on Hood Canal for recreational purposes for themselves and their families. The name of the corporation, Coon Bay Loafers, Inc., bespeaks something of the spirit and purpose of this enterprise. With the approval of all existing members, a new member might buy in. A member, with unanimous consent, could transfer his membership.

*Reported in 455 P.2d 359.

Membership in the corporation varied, but was never more than eight nor less than six.

The first piece of property acquired, known as the Home property, was conveyed to the corporation by two of the members whose interest therein was that of contract purchasers from Pope & Talbot, Inc. (purchase price $7,000). It was thereafter improved with a very substantial and commodious structure, known as the Lodge, built largely by labor and with material supplied by the members of the corporation. An adjoining tract, known as the Bluff property, was also purchased from Pope & Talbot, Inc. (purchase price $3,150). Payments were made on these two contracts by assessments on all of the "members of the corporation."[1] Neither of these properties has any relationship to this litigation, as they were conceded to be the property of the corporation.

In late 1955, there was talk of acquiring another tract of 105 acres (known as the Swamp property), which would round out their holdings and make control of trespassers during the hunting season more effective. Five of the then 8-member group were willing to make the purchase; the other members felt that they were not able financially to take on their share of the additional contract payments on the Swamp property. The five agreed to make the purchase as an investment of their own, but with the understanding—at least on the part of some—that the other members of Coon Bay Loafers, Inc., could come in on it by paying their proportionate share. (This seems to be an academic matter as none of the other members ever expressed any desire to buy in.)

The date of the contract for the Swamp property was November 23, 1955, with Coon Bay Loafers, Inc., named as the purchaser and Pope & Talbot, Inc., as the seller. The total purchase price was $5,750; $575 down, $52 a month. The down payment was made by each of the five, who were purchasing the property, giving Coon Bay Loafers, Inc., a

---

[1] "Members" is very properly used here; each had an equal share, and it was more a social club than a corporation.

check for $115. The corporation then gave its check for $575 to Pope & Talbot, Inc.

The monthly payments were handled in the same way as on the other contracts, except that only the five paid the assessments covering the contract payments and taxes on the Swamp property. The treasurer of Coon Bay Loafers, Inc., made the payments to Pope & Talbot, Inc., and the county treasurer. This continued through 1956, 1957, and the first 4 months of 1958.

Paul Shew, one of the original incorporators and one of the five purchasers of the Swamp property, withdrew from the Coon Bay Loafers, Inc., effective as of July 31, 1958. His financial interest therein was computed on the basis of his equity in the Home property, the Bluff property and the Lodge in the amount of $2,064.23. To this amount was added the sum of $31.20 (explained in footnote 3), making a total of $2,095.43. This was paid to him in monthly installments.[2] The money Mr. Shew received in consequence of his withdrawal from Coon Bay Loafers, Inc., was based on his equity in the corporate assets (the Home and Bluff properties and the Lodge). It had nothing whatever to do with the money that he had paid into the 5-man joint venture in the purchase of the Swamp property. He has never received back from any source any portion of the amount paid by him toward the acquisition of that property.[3] This

---

[2] To enable the corporation to pay off another member who had retired earlier, Mr. Shew agreed to wait until January, 1960, for his first installment. The last payment was in September, 1961.

[3] In the interest of exactitude, it should be noted that in exhibit No. 10, which shows how the $2,095.43 was computed, there appears, after listing the value of his equities in the Home and Bluff properties and the Lodge, an item:

Swamp lot .................................... $31.20
May, June and July installments included in budget but not made.

The explanation is that Mr. Shew's share of the $52.10 a month payment on the Swamp property was $10.40. He had made the May, June and July payments in advance to the treasurer of Coon Bay Loafers, Inc. When the five involved in the Swamp property purchase decided to discontinue payments as of April, 1958, it meant that the treasurer had already received payments for May, June and July from Mr. Shew and that amount was returnable to him. This payment had no conceivable relation to his equity in the Swamp property in which he had then invested more than $400.

included his down payment of $115 and 1/5 of the monthly payments through 1956, 1957 and 4 months of 1958. This, without taking his share of the taxes into consideration, would have approximated $400.

Not until a New Year's Eve party December 31, 1961, did Mr. Shew learn that the Swamp property (less a small portion sold earlier in 1958, likewise without notice to him), together with all of the assets of the corporation, had been sold on October 24, 1961, for $151,000.

It developed that the remaining six members[4] of Coon Bay Loafers, Inc., were receiving this amount in installments divided in the following percentages: The two who had not participated in the Swamp property purchase were each receiving 11.9562 percent of the payments as made; and the four who had participated in the Swamp property purchase were each receiving 19.0219 per cent. This indicated a very substantial allocation of value to the Swamp property.

Mr. Shew requested that he be permitted to participate in the proceeds of the sale of the Swamp property; and, failing to get any satisfaction, he commenced the present action seeking an accounting from the other four who had participated in the Swamp property purchase and to recover his proportionate share from the investment in that property. There was also the little matter of the amount which the four had received on the contract for the sale of the small portion of the Swamp property which had been sold in November, 1958. Although there are other defendants,[5] the other four members of Coon Bay Loafers, Inc., who had participated with Mr. Shew in acquiring the Swamp property will hereafter be referred to as the defendants.

---

[4]Mr. Shew's withdrawal had reduced the membership to six, and there was no change in the membership thereafter.

[5]Wives are also joined (because of the involvement of community property interests and liabilities) and Coon Bay Loafers, Inc., so that all interested parties would be before the court. Coon Bay Loafers, Inc., was made a defendant because title to the Swamp property had been taken in its name.

The defendants raised some technical defenses such as the statute of limitations and laches, but as we view the controversy, the real issue was whether there was any substantial evidence to sustain the trial court's finding that Mr. Shew had abandoned his interest in the transaction whereby he and the four defendants were acquiring the Swamp property.

A chronological resume is necessary to get the complete picture of what Mr. Shew knew or should have known relative to the Swamp property; and to determine whether the defendants had any duty to advise him of what was happening.

When Mr. Shew gave notice of his intention to withdraw from the Coon Bay Loafers, Inc., effective July 31, 1958, he indicated that he would also prefer to withdraw from further participation in the Swamp property purchase, but would agree "to continue if it will ease any problem arising from my withdrawal from Coon Bay Loafers." There was no indication that he intended to waive his then existing interest in the Swamp property.

At a meeting on May 2, 1958, Mr. Shew's impending withdrawal was discussed. The five interested in the Swamp property decided to discontinue payments as of April, 1958, on the Swamp property; however, it was agreed they would continue efforts to make a sale "until such time as this property is reclaimed by Pope & Talbot."[6]

Mr. Shew received a letter dated August 21, 1958, advising him that the "remaining members" had decided to resume payments on the Swamp property. It contained this sentence: "We assume you are still of the opinion that you are through with it and relinquishing any interest you have as of July 31, 1958."

September 11, 1958, Mr. Shew answered saying, "as I understand it, the swamp lot was not a part of the corporation so I do not know whether I am selling my equity in same, or not. Please advise."

---

[6]The quoted portion of this sentence is taken from the minutes of the meeting of May 2, 1958 (exhibit No. 8).

September 17, 1958, was the date of a letter[7] written to Mr. Shew by one of the defendants, Carl Schweizer, who testified that this letter was mailed. Mr. Shew testified that he never received it and, by way of possible explanation, said that he had been having marital difficulties at the time and had not been living at home during the latter part of 1958.

Less than 2 months later, November 10, 1958, a small portion of the Swamp property was sold for $4,500 ($1,000 down and the balance at $35 a month). This sale was for more than the balance then due on the entire Swamp property. Mr. Shew was never advised of this sale.

---

[7] "September 17, 1958

"Dear Former Member Shew:

"We are deeply disturbed over your inquiry of September 11.

"As you will recall a special meeting was held in June at which your request for withdrawal from Coon Bay was regretfully accepted. This to be effective July 31, 1958.

"We also discussed the High lot and decided to put it up for sale— we were successful in selling it for the original cost.

"The five interested members discussed the swamp purchase and it was mutually agreed to accept your suggestion that this property be put up for sale and payments to Pope & Talbot stopped as of April. It was further agreed that if we were unable to sell that swamp property by the time Pope & Talbot cancelled the contract we would then let them have it.

"As you know we have had no offers on the swamp nor any part of it by the end of July nor have we had any since although it is still listed.

"Toward the end of July, Pope & Talbot wrote asking if we wished to make payment arrangements or if they should consider the contract terminated. As we had previously agreed to make no more payments this had the effect of terminating our contract and forfeiting the equity of all of us. It completed the period in which we were to sell the property or write it off as a poor investment.

"Early in August the remaining members of Coon Bay agreed to revive the purchase of the swamp and all members agreed to pay their share. This was done as it was felt that the swamp added greatly to the value of Coon Bay as a hunting lodge, and hunting being the main attraction to most of the remaining members.

"If you still feel that you have an equity in this property regardless of the above explanation please let me know and I will be glad to discuss your views with the other members. As you well know we are most anxious to retain your friendship and good will.

"Respectfully yours."

(Exhibit No. 20)

Carl Schweizer testified that he wrote another letter to Mr. Shew on November 17, 1959, and mailed it that day.[8] Shew also denied receiving this letter; his explanation for not receiving mail at this time has been suggested above.

The trial court said it placed great reliance upon these letters of September 17, 1958, and November 17, 1959 (Mr.

---

[8] "Seattle, November 17, 1959
"Mr. Paul Shew
P. O. Box 610
Everett, Washington
"Dear Paul:

"Carol B. said you were wondering how your equity in Coon Bay was determined.

"We are attaching copies of statements and correspondence which we hope will be of help in answering any questions you may have.

"As you will recall, a special meeting was held on May 2, 1958 at which your request to withdraw from Coon Bay was regretfully accepted. This to be effective July 31, 1958. A copy of the minutes of this meeting is attached.

"In discussing the "high lot" at this same meeting, it was agreed to stop payments as of April and put it up for sale. If unable to find a buyer by the time Pope & Talbot cancelled our contract we would give it up and write it off as a bad investment. We were successful in selling it for $5.85 more than it cost.

"I'm sure you will also recall the five interested members discussed the Swamp lot. Your suggestion to stop payments as of April and offer it for sale until such time as Pope & Talbot cancelled our contract was concurred in by all of us. Here again it was agreed if we were unable to sell it would be written off as a bad investment.

"We were unsuccessful in finding a buyer. Towards the end of July Pope & Talbot wrote asking if we wished to make payment arrangements on this property or if the contract should be cancelled.

"As we had agreed to make no more payments, this notice signalled the impending termination of our contract and the forfeiting of our equity. It completed the period in which we were to sell the property or write it off as a poor investment.

"Early in August the remaining members of Coon Bay agreed to revive the purchase of the swamp and all members agreed to pay their share. This was done as it was felt the swamp added greatly to the value of Coon Bay as a hunting lodge and hunting being the main attraction of most of the remaining members.

"If you have any questions regarding any of the statements or wish any additional information, please let us know.

 "Yours truly,
 "C. A. Schweizer, Pres.
 "Coon Bay Loafers, Inc."
.(Exhibit No. 14)

Schweizer's office copies being admitted in evidence), together with the lack of any response from Mr. Shew as showing an abandonment by him of his interest in the Swamp property.

The trial court made a formal finding that Shew did receive the September 17, 1958, letter.[9]

The trial court made the following finding on which its failure to accord Mr. Shew an accounting against the defendants must rest:

On September 15,[10] 1958, a letter was sent by Carl Schweizer to the plaintiff, Paul Shew, and received by him (Exhibit No. 20) which put the plaintiff on notice that his equity in the "swamp" property was considered terminated unless he advised to the contrary. The plaintiff, knowing that his interest would be terminated unless he took further action, did not reply to said letter or at any time confer with any of the defendants herein, when he knew or as a reasonably prudent person should have known that some action was required on plaintiff's part to preserve his equity.

(Finding No. 10)

The trial court also concluded that the plaintiff's cause of action was barred by laches and by the statute of limitations, RCW 4.16.080(3), as an action based upon an oral contract. The trial court further concluded:

That the plaintiff by failing to take any action with respect to the letter of September 17, 1958 (Exhibit #20) when action was required abandoned any interest he had in said "swamp" property and is barred by the doctrine of laches from invoking any equitable relief.

We come now to a step-by-step analysis of this chronology to determine whether there is any basis to support the trial court's conclusion that Mr. Shew abandoned his interest in the joint business venture which he had entered into with the four other members of Coon Bay Loafers, Inc., for the acquisition of the Swamp property.

---

[9]While the trial court expressed reliance on both the September 17, 1958 and November 17, 1959 letters from Carl Schweizer, no formal finding was made with reference to the receipt of the latter letter by Mr. Shew.

[10]September 17 is intended.

In May, 1958, when payments were suspended by agreement of all five and they agreed that they would endeavor to sell the Swamp property until such time as Pope & Talbot Inc., reclaimed the property (forfeited the contract)—Mr. Shew's investment entitled him to a one-fifth interest in their equity in the property at that time.

The question then is how and when did he lose that interest, and how and when did the defendants acquire it.

He naturally would expect to lose his investment if Pope & Talbot, Inc., forfeited the contract and took back the property, but that never happened. There is not the slightest evidence that he intended to make a present of his interest to his joint venturers.

The next information he received was in August, 1958, when he was informed by letter that it had been decided to resume payments on the Swamp property.[11] It was indicated in that communication that it was assumed that he had relinquished his interest as of July 31, 1958.

If this was an attempt to get an acquiescence from Mr. Shew that he had relinquished his interest in their joint venture to acquire the Swamp property, it did not serve its purpose. His response was immediate; he reminded them that the Swamp property did not belong to the corporation and that he still considered himself as having an equity in it.

Then we come to the letter of September 17, 1958 (footnote 7), on which the trial court relies so heavily as establishing an abandonment. We assume, for the purposes of this discussion, that said letter was received by Mr. Shew. By what authority could his four joint venturers take over his investment and equity for themselves by a failure to respond to such a letter? They may contend, since the August letter had advised him that payments were being resumed on the Swamp property, that his failure to respond indicated that he did not desire to continue making payments. This might preclude him from acquiring any further

---

[11]Payments were made only by the four defendants, but these payments were channeled as before through the corporate account of Coon Bay Loafers, Inc.

interest therein, but it could not have the effect of turning over the interest he had already acquired to the other four members of the joint venture.

He was entitled to a one-fifth interest when payments stopped; when payments were resumed each payment made by the defendants may have reduced his proportionate interest and increased their individual proportionate interests, but there was still no procedure followed to forfeit his then existing interest and acquire it for themselves, if there is such a procedure.

It may be that there is some procedure in a venture of this kind whereby a noncontributing member can be compelled to forfeit his interest to those members continuing payments. If there is such a procedure, counsel have not directed our attention to it, and certainly the defendants never gave Mr. Shew a notice that if he did not resume payments his existing interest would be forfeited. We express no opinion as to whether the defendants could have acquired Mr. Shew's interest in that way. It appears to us that the alternative presented to the defendants was simple, *i.e.*, to buy Mr. Shew out, or recognize his interest.

If we assume that there is such a principle as loss by abandonment in an investment of this kind, the abandonment must have occurred some time between Mr. Shew's receipt of the Schweizer letter of September 17, 1958, and November 10, 1958, when defendants sold a portion of the Swamp property for $4,500 with $1,000 down. If he had any interest on November 10, 1958, his friends and joint venturers, the four defendants here, were obligated to tell him of this sale and share its proceeds. Only on the basis that Mr. Shew had no interest in the Swamp property on November 10, 1958, can the defendants justify their failure to advise him of that sale.

Their next communication (Mr. Schweizer's letter of November 17, 1959, which we will likewise assume Mr. Shew received, though he denies it), indicates that the defendants knew that Mr. Shew was still claiming an interest in the Swamp property. Mr. Schweizer reviews the situation and endeavors to persuade Mr. Shew that he

hasn't any interest, but most significantly fails to tell him. that more than a year earlier they sold a small part of the Swamp property for more than enough to pay the entire balance due Pope & Talbot, Inc.

The trial court indicated that it attached significance to the failure of Mr. Shew to respond to the "Dear Paul" letter of November 17, 1959, which Mr. Shew says he never received. If we assume he did receive it, it constitutes no more than damaging evidence of the intent to withhold information to which Mr. Shew was entitled. It was a self-serving attempt to persuade Mr. Shew that he had no interest in a property even though it had already been demonstrated it was a profitable investment. The concluding phrase "If you have any questions regarding any of the statements or wish any additional information, please let us know," adds, under the circumstances, a delightfully ironic touch.

■ Abandonment must be proved by clear, unequivocal and decisive evidence. *Tuschoff v. Westover*, 65 Wn.2d 69, 395 P.2d 630 (1964). The primary element to be established is an actual intent to relinquish or part with the right or rights claimed to be abandoned. *Manello v. Bornstine*, 44 Wn.2d 769, 270 P.2d 1059; 45 A.L.R.2d 494 (1954); 1 Am. Jur. 2d § 15.

Mr. Shew's failure to respond to the letter of September 17, 1958, falls far short of meeting that criteria, especially when read in connection with his own letter of September 11, 1958, distinguishing between his interests in Coon Bay Loafers, Inc., and his interest in the Swamp property. His continued claims that he had an interest in the Swamp property prompted the "Dear Paul" letter of November 17, 1959.

Because it has never been briefed nor presented to the trial court, we leave open the question of whether Mr. Shew lost his right to a one-fifth interest in the Swamp property when he made no effort to resume payments after the August 21, 1958, notice of resumption of payments. We merely hold that the evidence relied on by the trial court—

that Mr. Shew had abandoned all interest in the Swamp property—is neither clear, unequivocal nor decisive.

The trial court also relied on laches, and the statute of limitations as barring Mr. Shew's action.

 On the laches' theory the trial court again relied on Mr. Shew's failure to respond to the Schweizer letter of September 17, 1958. Within 2 months from that date, the defendants had sold a small portion of the Swamp property for $4,500. It is again necessary to point out that Mr. Shew was never advised of this fortuitious circumstance. Laches is an equitable defense and cannot be urged by those who are withholding information which would have prompted action by the plaintiff. *Topanga Corp. v. Gentile,* 249 Cal. App. 2d 681, 58 Cal. Rptr. 713 (1967).

 Laches is not mere delay, but delay which works to an adversary's disadvantage. *Pratt v. Water Dist. 79,* 58 Wn.2d 420, 363 P.2d 816 (1961); *Waldrip v. Olympia Oyster Co.,* 40 Wn.2d 469, 244 P.2d 273 (1952). The defendants fail to show any prejudice caused by Mr. Shew's failure to commence his action at an earlier date.

 The statute of limitations relied on (RCW 4.16-.080(3)—an action based on an oral contract) has no application. If the date of September 17, 1958, is to be accepted as the date on which the defendants gave notice that they were claiming adversely to Mr. Shew with reference to his interest in the Swamp property, his only action at that time would have been for an adjudication that he had an interest in the contract for the purchase of the Swamp property, and to have the extent of that interest determined. The applicable statute of limitations then was RCW 4.16.020 (10 years), governing an action for recovery of an interest in real property. *See Davies v. Metropolitan Life Ins. Co.,* 189 Wash. 138, 63 P.2d 529 (1937). If it were questionable which of the two statutes applied, the rule is that the statute applying the longest period is generally used. *Andersen v. Thude,* 42 Ariz. 271, 25 P.2d 272 (1933). In *Hughes v. Reed,* 46 F.2d 435, 440 (10th Cir. 1931), the court cites cases from many states in support of the proposi-

tion that "[w]here doubt exists as to the nature of the action, courts lean toward the application of the longer period of limitations."

When Mr. Shew learned on December 31, 1961, or January 1, 1962, that Coon Bay Loafers, Inc., no longer held title to the Swamp property and that it had been sold, his problem changed from establishing an interest in real property to establishing his interest in the proceeds of the sale. His action was commenced in 1964, well within the 6-year statute (RCW 4.16.040(3)), *i.e.,* "An action for the rents and profits . . . of real estate."

What has been said disposes of the major issues on this appeal. There is, however, a cross-appeal from the trial court's conclusion of law No. 1, which read:

> That the plaintiff has proved by a preponderance of the evidence that Coon Bay Loafers, Inc., held the "swamp" property as a resulting trustee for W. D. Botting and wife, Carl Schweizer and wife, T. A. Kinsman and wife, J. Heneghan and wife, and Paul Shew and wife, tenants in common,

and from the trial court's failure to make a requested conclusion of law that there had been an accord and satisfaction of all claims against the defendants when Mr. Shew made his settlement on May 2, 1958, with Coon Bay Loafers, Inc.

The short answer is that the trial court's conclusion as to a resulting trust was based on evidence which to it, and to us, was clear, cogent and convincing: That Coon Bay Loafers, Inc., held title to the Swamp property in trust for the five members of the corporation who were paying for it (four of whom have received and are now receiving the proceeds of the sale).

The accord and satisfaction contention rejected by the trial court—that Mr. Shew was disposing of his interest in the Swamp property when he made his settlement with Coon Bay Loafers, Inc.—simply has no foundation in fact and very little in fancy.

There is no merit in the cross-appeal.

The judgment in this case leaves things in a somewhat unusual posture.

It does no more than dismiss the action against Coon Bay Loafers, Inc., and it does not dismiss the action against the four individual defendants and their wives.

It is entirely possible that under the present posture of the property rights that the only parties against whom Mr. Shew, as plaintiff, is entitled to an accounting are the four named individual defendants and their wives who have received and are receiving his share of the proceeds from the sale of the Swamp property. While that relief is not specifically denied Mr. Shew by the judgment entered, it was in effect denied when the trial court refused to make the findings, conclusions and judgment which Mr. Shew, as plaintiff, requested.

We direct that the judgment entered be set aside, not because we are convinced that the judgment dismissing Coon Bay Loafers, Inc.,[12] is wrong, but because it may be necessary to clear the way for the accounting to which the plaintiff is entitled.

The only practicable procedure seems to be to remand this case to the trial court for an accounting from the individual defendants and their wives to the plaintiff, Mr. Shew, as to his proportionate interest in the proceeds of the two sales involving the Swamp property (the small tract sold November 10, 1958, and the remainder sold October 24, 1961).

The extent, if any, to which Coon Bay Loafers, Inc., has any remaining duty or obligation to Mr. Shew can be determined on the remand.

Costs on this appeal are not to be charged against Coon Bay Loafers, Inc., but only against the individual respondents and their respective marital communities.

ALL CONCUR.

[12]The exhibits indicate that the corporation, Coon Bay Loafers, Inc., may have been sold with its property, for the officers, as shown by the exhibits, are the officers of the Park Development Company, the purchaser referred to on page 43 of this opinion.