[No. 47817–1.   En Banc.   January 15, 1982.]

RETAIL CLERKS HEALTH & WELFARE TRUST FUNDS, ET AL,
*Petitioners,* v. SHOPLAND SUPERMARKET,
INC., *Respondent.*

RETAIL CLERKS WELFARE TRUST FUND, ET AL,
*Petitioners,* v. THE COMMISSION
COMPANY, INC., ET AL,
*Respondents.*

*Donaldson & Kiel, P.S.,* by *Sanford Levy,* for petitioners.

*Carmody, Syrdal, Danelo & Klein, P.S.,* by *Peter A. Danelo,* for respondents.

WILLIAMS, J.—This case is a consolidation of two actions brought by appellants Retail Clerks Health & Welfare Trust Funds and the Retail Clerks Pension Trust Funds to collect employee benefit contributions allegedly due from respondents Shopland Supermarket, Inc., and West Dependable Stores of Everett, Inc., for the contract periods 1971–74 and 1974–77. The trial court entered a judgment dismissing the claims. The Court of Appeals, Division One, affirmed the judgment of dismissal. We reverse.

Petitioners are two trust funds created pursuant to section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). Respondents, Shopland Supermarket, Inc., and West Dependable Stores of Everett, Inc., are engaged in the retail grocery business in ˙Snohomish County. At all times material to this action, Harold L. Cohen has been president of both corporations.

Teamsters Local 38 (the union) represents grocery industry employees in the Everett area. For the past 20 years, the union has engaged in collective bargaining with Allied Employers, Inc., an association of large retail grocery stores. These negotiations have produced a series of 3–year agreements that require the stores to make health, welfare, and pension fund contributions to the petitioner trust funds on behalf of their employees. The respondent employers are not members of Allied Employers, Inc., and are not bound by the above negotiations.

In 1971 and 1974 Frank Donavan, the local union representative, presented the contracts negotiated with Allied Employers to Mr. Cohen and asked him to sign identical contracts on behalf of his stores. In 1971, Cohen signed the contract without noting any objections thereon. In 1974, Cohen again signed, but this time with the notation "Signed under coercian [*sic*]. Did not have the right to negotiate—complete blackmail." Exhibit 1.

To ensure proper trust fund contributions, petitioners conduct random audits of participating employers. Audits of the respondent employers revealed that they had consistently contributed for their full–time employees, but that over $70,000 had not been paid for part–time employees as required by the collective bargaining agreements. The petitioners instituted these actions on behalf of respondents' employees to collect unpaid contributions dating back to 1968. The respondents answered and asserted various affirmative defenses, including laches. The petitioners have now abandoned their claims based on an alleged 1968 contract, which was lost, but maintain their claims as to the 1971 and 1974 contracts.

At trial, Mr. Cohen testified that he had not intended to be bound on either the 1971 or the 1974 contract. The evidence also showed that since 1959, Cohen's stores had paid into a trust fund on behalf of their full–time employees. Over the petitioners' objections, the jury was given the respondents' proposed instructions Nos. 11 and 14. Instruction No. 11 told the jury that petitioners had the burden of proving that Harold Cohen "indicated an intent to be bound in a contractual relationship". Clerk's Papers, at 22. Instruction No. 14 set forth the elements of laches.

The jury answered a series of special interrogatories, finding that the petitioners had not proven the existence of any written collective bargaining agreements, that Harold L. Cohen had not indicated an intent to be bound by the contracts and had not ratified the agreements, and that the respondents had proven their laches defense. The trial court then entered findings of fact, conclusions of law, and a judgment dismissing petitioners' action. The Court of Appeals, Division One, affirmed by an unpublished 2–to–1 decision in *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.,* 28 Wn. App. 1033 (1981).

I. *Existence of written collective bargaining agreements.*

The jury was presented with a series of five interrogatories which they were asked to answer in arriving at their decision. Special interrogatory No. 1 asked the jury:

Did the plaintiff's [Trust Funds] prove that there existed a written collective bargaining agreement signed by both Teamster Union Local 38 ("the Union") and the defendants, for each of the following periods:
  a. 1968–1971 ANSWER: _____ (Yes or No)
  b. 1971–1974 ANSWER: _____ (Yes or No)
  c. 1974–1977 ANSWER: _____ (Yes or No)

Clerk's Papers, at 8. The jury answered "No" for each of the three contract periods. Petitioners have dropped their appeal as to the 1968–71 contract, but as to the other two periods there was no dispute as to the existence of the 1971 and 1974 written contracts. In fact, Mr. Cohen admitted

having read and signed the 1971 and 1974 contracts, and those documents were admitted into evidence.

The credibility of witnesses and the weight to be given the evidence are matters which rest within the province of the jury; and, even if the court were convinced that a wrong verdict had been rendered, it should not substitute its judgment for that of the jury so long as there was evidence which, if believed, would support the verdict rendered. *Burke v. Pepsi–Cola Bottling Co.,* 64 Wn.2d 244, 246, 391 P.2d 194 (1964). The court will overturn a jury's verdict only rarely and then only when it is clear that there was no substantial evidence upon which the jury could have rested its verdict. *State v. O'Connell,* 83 Wn.2d 797, 839, 523 P.2d 872, 77 A.L.R.3d 874 (1974); *Valente v. Bailey,* 74 Wn.2d 857, 859, 447 P.2d 589 (1968).

Here, we find no substantial evidence to support the jury's conclusion that the written contracts did not exist. Perhaps the jury believed that without a manifestation of intent to be bound, there was no document which embodied the agreement of the parties. This reasoning, however, does not respond to the interrogatory posed, and the answer "No" as to the existence of the 1971–74 and 1974–77 contracts is simply unsupported by the evidence. Therefore, we find that by producing signed copies of the 1971–74 and 1974–77 contracts, the petitioners did prove the existence of those written documents.

II. *Cohen's intent to be bound by the 1971 and 1974 contracts.*

The trial court instructed the jury that petitioners had the burden of proof as to Mr. Cohen's intent to be bound by the 1971 and 1974 contracts. Since Cohen admitted that he read and signed those documents, the trial court's instruction was tantamount to requiring the petitioners to prove Mr. Cohen's *subjective* intent to be bound. This is directly contrary to our policy of looking to the *objective* manifestation of intent as expressed in the writing. *See Barclay v. Spokane,* 83 Wn.2d 698, 521 P.2d 937 (1974);

*Jacoby v. Grays Harbor Chair & Mfg. Co.,* 77 Wn.2d 911, 918, 468 P.2d 666 (1970).

The proponent of a contract need only prove the existence of the contract and the other party's objective manifestation of intent to be bound thereby; the unexpressed subjective intent of either party is irrelevant. *Barclay,* at 700; *Jacoby,* at 918. In the present case, the petitioners produced the 1971 and 1974 contracts along with the objective manifestation of Cohen's intent to be bound: his signatures. Mr. Cohen's subjective intent not to be bound was irrelevant. Therefore, the trial court's instruction was erroneous. At that point, the burden shifts to the party seeking to avoid the contract to prove a defense to the contract's enforcement.

Mr. Cohen's testimony and notation on the 1974 contract indicate that his primary contention is that duress or coercion invalidated his assent to the terms of the collective bargaining agreement. A party to a contract which he has voluntarily signed cannot, in the absence of fraud, deceit, or coercion be heard to repudiate his own signature. *National Bank of Wash. v. Equity Investors,* 81 Wn.2d 886, 912, 506 P.2d 20 (1973). Duress or business compulsion is a defense which must be proven by the "victim" who seeks to escape liability. *See Barker v. Walter Hogan Enterprises, Inc.,* 23 Wn. App. 450, 596 P.2d 1359 (1979). To establish duress or coercion, there must be proof of more than reluctance to accept or financial embarrassment. The assertion of duress must be proven by evidence that the duress resulted from the other's wrongful or oppressive conduct. The mere fact that a contract is entered into under stress or pecuniary necessity is insufficient. *Culinary Workers Local 596 Trust v. Gateway Cafe, Inc.,* 91 Wn.2d 353, 363, 588 P.2d 1334 (1979); *Puget Sound Power & Light Co. v. Shulman,* 84 Wn.2d 433, 442–43, 526 P.2d 1210 (1974). *See also W.R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir. 1957); 13 S. Williston, *Contracts* § 1606 (3d ed. 1970). Generally, circumstances must demonstrate a person was deprived of his free will at the

time he entered into the challenged agreement in order to sustain a claim of duress. *Whitman Realty & Inv. Co. v. Day,* 161 Wash. 72, 77, 296 P. 171 (1931).

It appears that Mr. Cohen's notation of a possible "coercion" defense on the 1974 contract was little more than a feeble protestation of an unfair labor practice. Apparently, Mr. Cohen believed the union was presenting him with a "take it or leave it" collective bargaining agreement and thus was failing to bargain in good faith. *See* National Labor Relations Act, 29 U.S.C. § 158(b)(3). To our knowledge, there was no attempt to file a formal complaint of an unfair labor practice with the National Labor Relations Board. Mr. Cohen's notation on the 1974 contract and belief of a possible failure to bargain in good faith, however, do not prove the defense of coercion or business compulsion, and certainly cannot justify the trial court's erroneous instruction.

Since petitioners produced the 1971 and 1974 contracts and demonstrated Mr. Cohen's objective intent to be bound by the contracts, the burden shifted to the respondents to prove a defense to those contracts. We find insufficient evidence to establish the claimed coercion or business compulsion defense. Therefore, it appears to us that a valid contract was formed for each of the contract periods 1971–74 and 1974–77.

> III. *Is extrinsic evidence admissible to establish the nonexistence of a collective bargaining agreement?*

This action was brought under section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), to enforce rights arising out of a collective bargaining agreement. Therefore, the general body of federal labor law applies. *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 7 L. Ed. 2d 593, 82 S. Ct. 571 (1962); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 7 L. Ed. 2d 483, 82 S. Ct. 519 (1962). In general, collective bargaining agreements are governed by the ordinary rules of contract law. *Barclay,*

at 700. Common law contract principles do not govern, however, where they conflict with federal labor policy. *Restaurant Employees Fund v. Rhodes,* 90 Wn.2d 162, 165, 580 P.2d 611 (1978). *Accord, Walsh v. Schlecht,* 429 U.S. 401, 50 L. Ed. 2d 641, 97 S. Ct. 679 (1977); *Gatliff Coal Co. v. Cox,* 152 F.2d 52 (6th Cir. 1945).

The petitioners argue that the trial court erred in permitting parol evidence to be admitted regarding Mr. Cohen's intention not be be bound by the contracts. The Court of Appeals, in the present case, held that parol evidence was admissible to establish the nonexistence of a collective bargaining agreement.

The normal rules of offer and acceptance are said to govern the formation of collective bargaining agreements. *Teamsters Local 524 v. Billington,* 402 F.2d 510, 513 n.2 (9th Cir. 1968). Extraneous evidence is generally admissible to show the mutual intention of the parties was not to enter into an enforceable contract, and that a writing never became operative. *See Bond v. Wiegardt,* 36 Wn.2d 41, 216 P.2d 196 (1950); 3 A. Corbin, *Contracts* § 577 (1960). From the above authorities, it is apparent that the normal rules of contract law would permit the introduction of parol evidence tending to show that a contract never became operative. The remaining question, then, is whether those common law contract principles are superseded by federal labor policy. We conclude that the national labor policy of insulating collective bargaining agreements from attacks based on alleged "sham" or oral side agreements precludes the introduction of parol evidence in this case.

As we noted in our opinion in *Rhodes,* there is a strong federal labor policy which favors written labor contracts. *See H.J. Heinz Co. v. NLRB,* 311 U.S. 514, 525–26, 85 L. Ed. 309, 61 S. Ct. 320 (1941). We have also noted the strong policy in favor of the enforcement of such labor contracts. *See Trust Fund Servs. v. Heyman,* 88 Wn.2d 698, 565 P.2d 805 (1977). Additionally, there is a strong federal policy favoring the protection of trust funds, provided they are maintained according to federal law, because of the fact

that employees are presumed to have worked in reliance upon them and upon the availability of their benefits. *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 467–70, 4 L. Ed. 2d 442, 80 S. Ct. 489 (1960); *Lewis v. Seanor Coal Co.,* 256 F. Supp. 456 (W.D. Pa. 1966), *aff'd,* 382 F.2d 437 (3d Cir. 1967), *cert. denied,* 390 U.S. 947, 19 L. Ed. 2d 1137, 88 S. Ct. 1035 (1968). These policies have been adopted to promote the stabilization of industrial relations.

In *Rhodes,* we held that federal labor policy prevented the employer from relying on parol representations of union officials to vary the terms of a labor contract. We went on to hold that collective bargaining agreements must be insulated from attacks based on alleged sham or oral side agreements. *Rhodes,* at 165–68. The following language, setting forth the reasons for the federal labor policy, was quoted in *Rhodes* and is equally applicable in the present case:

> To be sure, there are two possible evils to consider in connection with such a national labor policy. One is the overzealous or unprincipled union negotiator who will induce a management signature to a collective bargaining agreement with side assurances that management will not have to comply with certain controverted provisions. The other is management who will avoid certain obligations required by the executed collective bargaining agreement and attempt to justify such action by an alleged oral side agreement that compliance will not be required notwithstanding the clear and unambiguous requirement of the written collective bargaining agreement. To suppress industrial strife based on this type of controversy national labor policy requires that the clear and unambiguous requirements of the written collective bargaining agreement be immune from attack found [*sic*] on a covert side agreement.

*Rhodes,* at 168, quoting from *Local 509, ILGWU v. Annshire Garment Co.,* 65 L.R.R.M. 2769, 2772 (D. Kan. 1967).

The existence of an oral side agreement making the signed contracts a "sham" is evidenced by the following testimony of Mr. Cohen, which was admitted over the peti-

tioners' objections:

> Q: And what came out of that conversation? A: And we discussed and discussed, and finally I told him—he says he [union negotiator] has to have a contract, and I says, "Frank, I cannot live with that kind of contract," and I says, *"Now, if you want this signed and it will not cause any problem down at your office, I will sign it subject to what I write on the bottom of it." He says, "That's fine, you will never have no problems of any kind. There will be no strikes against you."* I therefore signed it. Q: *Did he tell you that you would not be bound by that contract? A: He absolutely mentioned that.* Q: That was in 1974? A: Correct. Q: And after those conversations, did you sign that contract with the comment that you added to it? A: I did do that, yes, in front of him. Q: Did you intend at any time, either at the time you added that statement to the contract or at any time since then, to become bound to a collective bargaining agreement with Teamsters Local No. 38? . . . A: No.

(Italics ours.) Report of Proceedings, at 228–29. It seems Mr. Cohen believed he could sign the agreement with the union and reserve the right to exempt his stores from the effect of its provisions. We do not agree.

We are satisfied this case is controlled by our decision in *Rhodes*. To permit the respondents' allegations of an oral side agreement making the written labor contract a "sham" seems, to us, to promote rather than suppress industrial strife. We will not permit such a defense to a collective bargaining agreement to emasculate the federal labor policy intended by Congress. The trial court erred in permitting the parol evidence of Mr. Cohen's intention not to be bound by the contracts he signed.

### IV. *Equitable defense of laches.*

Respondents contend that if there was any cause of action it arose in 1968, and that the opportunity to discover any alleged underpayment of employee contributions existed from that time. Therefore, they assert the equitable defense of laches. Laches "is an equitable principle that in a general sense relates to neglect for an unreasonable length

of time, under circumstances permitting diligence, to do what in law should have been done." *Arnold v. Melani,* 75 Wn.2d 143, 147, 437 P.2d 908 (1968); *In re Estate of Tuott,* 25 Wn. App. 259, 261, 606 P.2d 706 (1980).

We find it unnecessary to determine whether the elements of laches can be satisfied in the case before us. Since laches is an equitable defense, it cannot successfully be urged by those who withhold information which would have prompted action at an earlier time. *Shew v. Coon Bay Loafers, Inc.,* 76 Wn.2d 40, 51, 455 P.2d 359 (1969); *In re Estate of Novolich,* 7 Wn. App. 495, 502, 500 P.2d 1297 (1972). This principle is expressed by the old equity maxims: "He who seeks equity must do equity", and "he who comes into equity must come with clean hands." It appears to us that the respondents come before the court with "unclean hands".

In the present case, the respondents are responsible for the breach of the collective bargaining agreement and have withheld information which would have prompted action at an earlier date. The breach was not discovered until the petitioners conducted an audit of the respondent employers and found the respondents' failure to contribute to the trust funds for part–time employees, as required by the contract. The Health and Welfare Trust involves 730 participating employers and some 17,600 employees while the Pension Trust involves 920 participating employers and 21,700 employees. With such vast numbers of employers to watch over, the petitioners could not tell if any employer was paying and reporting accurately without an audit. By withholding information of their reporting practices, the respondents effectively hid the breach from the petitioners until such time as an audit could be performed. To permit the respondents to now assert a laches defense to this action would be to reward them for their inequitable conduct. This we cannot permit.

For all of the above reasons, we reverse and remand with instructions to enter judgment in favor of the petitioners. The only remaining issue to be determined upon retrial

shall be the amount of damages to be awarded.
Reversed and remanded with instructions.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, HICKS, DORE, and DIMMICK, JJ., concur.