IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BOLIVAR REAL ESTATE, LLC, a | ) | No. 38967-7-III |
| Washington Limited Liability and | ) | |
| JAMISON EASTBURG, an individual, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | |
| ROCHELLE PRATT, an individual, and | ) | |
| DIANA PRATT, an individual, | ) | |
| | ) | |
| Appellants. | ) | |

LAWRENCE-BERREY, J. — Rochelle and Diana Pratt appeal the trial court's

summary judgment order enforcing a settlement agreement and awarding reasonable

attorney fees and costs in accordance with the agreement. The Pratts contend the trial

court erred because genuine issues of material fact exist supporting their defenses of

duress, breach of agreement, and unconscionability. We affirm the trial court and award

the respondents their reasonable attorney fees and costs on appeal.

FACTS

We set forth the facts, below, in the light most favorable to the Pratts, the party

resisting summary judgment below.

*The Pratts' tenancy before the CR 2A agreement*

Douglas and Dawn Burpee, through Bolivar Real Estate, LLC (Bolivar) owned a

property in Spokane Valley that contained a main house and a smaller cottage. The

Burpees leased the property to their son, Jamison Eastburg, who lived in the main house

and, beginning in December 2019, he subleased the cottage to Rochelle and Diana Pratt.[1]

Throughout their tenancy, Mr. Eastburg and the Pratts had numerous

disagreements. Rather than recount all of the various disagreements, it is sufficient to say

that as the relationship deteriorated, Mr. Eastburg engaged in repeated acts of harassment

and retaliation.

In June 2021, Rochelle injured her toe when a brick in a pile in the shared yard fell

on her foot. Due to the injury, Rochelle needed to have her toenail removed, resulting in

great pain when walking.

In August 2021, Mr. Eastburg and Bolivar served separate 90-day notices of

termination on the Pratts, informing them that Bolivar was selling the property and the

Pratts' tenancy would terminate on November 30, 2021.

---

[1] Because the Pratts share the same last name, we shall refer to them by their first
names. We mean no disrespect.

2

In October 2021, the Pratts researched Mr. Eastburg and discovered he had a previous restraining order against him.

In early November, Mr. Eastburg used his air compressor to blow the water out of the sprinkler system, hitting Diana with the water, hurting her skin, startling her, and causing her to jump up and hurt her knees, which had a history of injury. Diana had to go to urgent care for her knee pain and reported the incident to the police nonemergency line.

*Negotiation of the CR 2A agreement*

The parties disputed the Pratts' existing lease status. Bolivar and Mr. Eastburg[2] took the position that the Pratts were on a month-to-month lease since their written one-year lease had expired on May 31, 2021. The Pratts took the position that they had renewed the lease, over text message, for an additional one-year term, until May 31, 2022, and thus the notice of termination was ineffective.

Both sides negotiated through counsel beginning in early November 2021. The Pratts repeatedly rejected Bolivar's proposals. On November 27, counsel for the Pratts wrote to counsel for Bolivar that Rochelle was

> willing to waive any tort claims against your client for her injured foot, and would agree to end her tenancy May 31, 2022, if your client will rescind the 90[-]day notice. Your clients would of course be free to sell the home prior to May 31, subject to the tenancy.

---

[2] For brevity, we will now refer to both collectively as "Bolivar."

Clerk's Papers (CP) at 208. After proposing a counteroffer, which the Pratts again rejected, Bolivar accepted the Pratts' offer on December 8, 2021.

The parties executed a CR 2A agreement, which provided that it "constitute[d] the entire agreement between the Parties." CP at 216. The agreement further provided:

> 1. Tenants agree that the tenancy for the Premises shall terminate on May 31, 2022 as a matter of law and that this Agreement constitutes notice of termination of the tenancy for the Premises pursuant to RCW 59.18.650.
> 2. Tenants specifically waive any and all claims or causes of action under the residential landlord tenants statute related to termination of a periodic and/or year tenancy. Tenants further agree that this Agreement constitutes written notice and acceptance of notice pursuant to RCW 59.18.650(5) that the tenancy is ending in order to sell the Premises pursuant to RCW 59.18.650(2)(e).
> 3. Tenants shall continue to pay rent and meet all other obligations imposed by the residential lease agreement until termination of the tenancy as set forth in paragraph 1.
> 4. Owner agrees to withdraw the previously issued 90[-]day notice of sale provided to the tenant to terminate the tenancy November 30, 2021. Owner may immediately sell the Premises. Tenants agree to allow Owner reasonable access for an appraisal, to remove the air conditioning unit, and other access to the Premises as provided in RCW Chapter 59.18 upon written notice from the Owner and/or Landlord as also provided in RCW Chapter 59.18.
> 5. This Agreement does not waive any remedies available to the Owner and/or Landlord related to eviction for cause as set forth in RCW 59.18.650(2)(a), (b), (c), (h), (1), (m), (n), (o), (p).
> 6. Tenants shall sign a separate settlement agreement releasing any claim for wrongful eviction under RCW Chapter 59.12 an RCW Chapter 59.18, any claim for tort liability for injuries allegedly sustained on the Premises, and an agreement which incorporates the provisions of this Agreement. The prevailing party in any legal proceedings to enforce the

4

terms of this Agreement and/or the executed settlement agreement shall be entitled to payment of all attorney fees and costs incurred.

CP at 216-17. All parties signed the CR 2A agreement on December 13, 2021. Shortly after, Bolivar Real Estate, LLC, sold the property to Mr. Eastburg.

After various minor delays, on January 11, 2022, the Pratts' attorney sent his clients a copy of the proposed release agreement. The Pratts expressed concern that the property had actually been sold on December 2, 2021, which was before the CR 2A agreement was signed. It emerged that although the real estate excise tax affidavit was dated either December 2 or 3, 2021, it was signed by the grantor on December 29, 2021 and the grantee on January 3, 2022. Although dated December 2, 2021, the deed was signed and notarized on December 29 and recorded on January 4, 2022. According to the title company, the documents had originally been prepared in early December, but the sale had been put on hold because of ongoing negotiations between the parties.

Rochelle was not physically able to visit a notary in January, so the Pratts did not sign the release agreement. After Bolivar's attorney offered to arrange a notary to visit the Pratts' home, the Pratts informed their attorney that Mr. Eastburg was harassing them. The Pratts' attorney had completed the scope of his representation under RCW 59.18.640 and, after several attempts to have the Pratts sign the release agreement, withdrew from the case.

On February 25, in response to an e-mail from Bolivar's attorney, Diana indicated that the release agreement was a "problematic document." CP at 260. She indicated Rochelle had exhausted her means to have the attorney "get your clients to stop harassing, abusing, injuring us and harming our disabilities, and to also stop blocking our USPS[3] mailbox." CP at 260. She further indicated they had filed a grievance against their former counsel because he would not help them resolve the issues with the harassment. Diana wrote that Rochelle had tried to raise issues about Mr. Eastburg

> causing Rochelle Pratt numerous new injuries that harmed her disabilities starting on December 14, 2021 that he continued to cause her intermittently up to January 15, 2022, and then regarding yet another new harassment and abuse tactic he began on January 21, 2022 that also injured her harming her disabilities and creating new ones, that [Mr. Eastburg] kept doing to us throughout the negotiating process . . . .

CP at 260.

She indicated that she and Rochelle were unaware the property would be sold to Mr. Eastburg, and wrote:

> It [is] reasonable that [the Burpees] would know that we would want and need to know that Jamison Eastburg, our abuser and tormentor, would soon be the sole owner of our rental so we could make an informed decision on 12-09-2021 as to whether or not we wanted to sign their settlement offer and willingly place ourselves in the control of Jamison Eastburg and his harassment of us, which of course we would not have wanted to do. We

---

[3] United States Postal Service.

had the right to make that informed decision and your clients robbed us of
that option.

CP at 258.

*Action to enforce the CR 2A agreement*

On February 28, Bolivar filed a complaint against the Pratts requesting specific

performance of the CR 2A agreement, including, but not limited to, execution of the

release agreement as outlined in the CR 2A agreement. Bolivar also sought attorney fees,

as provided for in the CR 2A agreement. On April 13, 2022, Bolivar moved for summary

judgment on the basis that the CR 2A agreement was valid and enforceable.

Acting pro se, the Pratts responded that Bolivar materially breached the CR 2A

agreement, that Bolivar offered the CR 2A agreement to the Pratts in bad faith and signed

it in bad faith, and that the agreement was unconscionable. The Pratts argued that Mr.

Eastburg had begun harassing them in an attempt to constructively evict them beginning

the day after they had signed the CR 2A agreement. On December 14, 2021, he began

flashing a security camera spotlight into their faces and eyes as they walked outside on

their side of the property, "immediately causing [Rochelle] eye strain and an aura

migraine, and also causing her to slip on the ice and snow[,] jerking herself to keep from

falling[,] which caused her to pull her ribs out that her PT[4] had just put back in place for her the day before." CP at 309. Rochelle had to visit urgent care for her injuries. On January 15, Rochelle was carrying a gallon of milk toward the front porch when Mr. Eastburg flashed the light for the first time in two weeks, causing Rochelle to visit the hospital.

On January 21, 2022, Mr. Eastburg flashed the light through their bathroom window at night, startling Rochelle and causing her to slip off a step and wrench her neck. This caused Rochelle to experience vertigo, keeping her awake all night and requiring intervention from her physical therapists. The Pratts had to install a blackout curtain to block the light from coming in their bathroom window, which they had to leave closed at all hours because the light exacerbated the women's medical conditions.

After the parties signed the CR 2A agreement, the Burpees, Mr. Eastburg, and their friends and family continued to harass the Pratts by obstructing the Pratts' mail receptacle, preventing the mail carrier from delivering mail.[5] The post office sent a warning to the Pratts and Mr. Eastburg on December 10, 2021. The last time the Burpees,

---

[4] Physical therapist.

[5] It is unclear when or if the Pratts resumed having mail delivered to their house instead of having it held at the post office. In their briefing, they indicate they did not have their mail delivered to their house for the remainder of their tenancy.

Mr. Eastburg, or their friends and family purposely blocked the mailbox was on February 23, 2022.

On March 29, 2022, Mr. Eastburg turned on the automatic sprinkler system twice in one morning. The second time he activated the sprinklers, they covered Diana's path into the home after she returned from a walk. Because she was in too much pain to wait 30 minutes for the sprinklers to turn off, she was forced to walk through the sprinklers. The Pratts sent a cease and desist letter to Mr. Eastburg's attorney on April 4, after which Mr. Eastburg did not turn the sprinklers on after 6 a.m.

The Pratts argued it was unconscionable that their landlords asked them to sign a contract "where we were to give up our rights to sue . . . for wrongful eviction and injuring us while they continued to harass and constructively evict us." CP at 311. They believed the CR 2A agreement had been offered in bad faith and that Bolivar had failed to honor the implied covenant of good faith and fair dealing because it did not "voluntarily choos[e] to no longer harass us, injure us or expose us to injury, or keep trying to constructively evict us." CP at 313. The Pratts contended Bolivar thus breached the CR 2A agreement.

Further, the Pratts contended that Bolivar had a duty to disclose its intention to convey the property to Mr. Eastburg because Bolivar reasonably knew the Pratts would be

"alarmed and scared for [their] safety being abandoned to the control of [the Burpees']

son." CP at 314. When the Pratts signed the CR 2A agreement, they believed the

property would be sold on the open market, not to Mr. Eastburg. They argued it was

unconscionable to place them in danger by selling the property to Mr. Eastburg.

The Pratts indicated the CR 2A agreement was further unconscionable because it

empowered Bolivar to threaten eviction and only rescind the threat if the Pratts agreed to

give up their rights to sue for wrongful eviction and other injuries. They signed under

unfair duress because they were being "abused, mistreated, harassed, and injured or

harmed medically." CP at 316. After signing the CR 2A agreement, they had filed

complaints with the Human Rights Commission and the Department of Justice.

The Pratts summarized the genuine issues of material fact that precluded summary

judgment:

> [T]he Plaintiffs showing bad faith in offering and the signing of the
> CR[ ]2A [agreement] and by withholding information from us they knew
> we needed and deserved to know[;] breaching the CR[ ]2A contract with
> their continued harassment of us and robbing us of having our mail
> delivered to our legal address and of peace, safety, and enjoyment of our
> home; and because the Plaintiffs offered an unconscionable contract to us,
> the Defendants, after one of their tenants was injured on their property
> using the threat of an eviction in order to protect themselves from being
> held accountable for their illegal actions against their tenants that they did
> to them when retaliating against them for being injured.

CP at 325.

10

*Summary judgment hearing*

At the hearing, Bolivar argued the only issues before the court were whether the CR 2A agreement was enforceable, whether that agreement required the Pratts to sign the release agreement, and whether they were entitled to specific performance and attorney fees. The Pratts did not dispute that the CR 2A agreement existed, that they proposed the relevant terms, that everybody understood and signed it, and that their attorneys agreed to it. The Pratts admitted the property was not actually sold to Mr. Eastburg until after the CR 2A agreement was signed.

Bolivar argued the agreement was neither procedurally nor substantively unconscionable because the Pratts were represented by counsel and proposed the terms of the agreement themselves. The agreement was not signed under duress because the Pratts did not show conditions deprived them of their free will. There was no bad faith by Bolivar regarding selling to Mr. Eastburg because the CR 2A agreement did not restrict Bolivar's choice of buyer for the property. The Pratts' constructive eviction claim failed because they never vacated the premises, a necessary requirement of constructive eviction. Even if the Pratts had vacated, the issues with the lights, mailbox, and sprinkler use did not warrant a finding of constructive eviction.

Diana appeared on behalf of herself and her daughter and detailed the Pratts'

conflict with Mr. Eastburg beginning in the summer of 2021. The court noted that after

all those things occurred, the Pratts nonetheless signed the CR 2A agreement. Diana

explained they did so "[b]ecause we believed that the harassment would stop. We

believed that if they were going to ask us to give up the benefit of suing them for

wrongful eviction or injuring us that they would no longer harass us." Rep. of Proc.

(RP) at 17. They would not have signed the CR 2A agreement if they knew Bolivar had

begun paperwork to convey the property to Mr. Eastburg. Diana argued the Burpees

"should have communicated that to us so we could make an informed decision."

RP at 20.

The court questioned whether the Pratts had a right to sue Mr. Eastburg for

harassment occurring after the CR 2A agreement had been signed and Bolivar's attorney

agreed the Pratts could, because the parties had agreed to release tort claims that accrued

only prior to the agreement. The court ultimately ruled:

> The parties each had counsel. And if the Pratt's [sic] counsel failed to give
> appropriate legal advice by their evaluation, they have a beef with their
> counsel. I have nothing before me that would indicate that the CR[ ]2A
> [agreement] was contingent on the Pratts getting to approve to whom
> Bolivar Real Estate, LLC, sold this property.
>     Likewise, I have nothing before me that would indicate the CR[ ]2A
> [agreement] is not effective. . . . I find it to be enforceable. I find that the
> terms are clear . . . .

> . . . .
>
> . . . I do find from the facts before me that the failure to sign a release pursuant to the CR[ ]2A [agreement] is a violation of the CR[ ]2A [agreement,] which is an enforceable contract. So I do believe that Plaintiff is entitled to enforcement of the CR[ ]2A [agreement] as a contract . . . . I don't find any unconscionable or violations of the good faith and fair dealing at the time of the signing of the contract, the CR[ ]2A [agreement]. I also don't find that there's anything in the CR[ ]2A [agreement] that prohibits the Pratts from bringing, if they choose to, a—any appropriate cause of action post-signing of the CR[ ]2A [agreement] if there's some further . . . allegations of trespass[,] of intimidation, of such behavior in violation of their rights as against Jamison Eastburg as have been alleged here.
>
> . . . .
>
> So for that reason, I'm going to grant the Plaintiff's [sic] Motion for Summary Judgment.

RP at 27-29.

The Pratts appealed.

## ANALYSIS

ENFORCEABILITY OF THE CR 2A AGREEMENT

The Pratts contend there were genuine issues of material fact precluding summary judgment below. We disagree.

We review a summary judgment de novo, "engag[ing] in the same inquiry as the trial court." *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). A party moving for summary judgment must show there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. CR 56(c). A

13

material fact is one on which the outcome of the litigation depends. *Clements*, 121

Wn.2d at 249. The party opposing summary judgment "may not rest upon the mere

allegations or denials of a pleading, but a response, by affidavits or as otherwise provided

in [CR 56], must set forth specific facts showing that there is a genuine issue for trial."

CR 56(e). In deciding a motion for summary judgment, the court views all facts and

reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Clements*, 121 Wn.2d at 249.

The Pratts present, at length, a number of disputed facts concerning their

relationship with their landlords.[6] None are material to the issue before us, however,

which is whether the CR 2A agreement is enforceable.[7]

---

[6] We note that none of the Pratts' exhibits in the trial court are sworn or certified in accordance with CR 56(e), and many are not identified with sufficient particularity for the court to discern their significance. Because Bolivar does not object to consideration of the exhibits and because, even taking their evidence as true, the Pratts do not raise any genuine issues of material fact, we will assume that the Pratts' exhibits are true and correct copies of what they purport to be, to the extent we can sufficiently identify them.

[7] The Pratts place great weight on the impact of their third lease renewal over text message and on alleged perjury (misstating the date of the beginning of the Pratts' first lease) in an affidavit signed by Dawn Burpee that appears to have been connected to the 90-day notice of termination. Those issues were resolved by the CR 2A agreement, which withdrew the notice of termination and provided the Pratts could stay through their claimed third lease period. The impact of the text message lease renewal and any false statements by the Burpees regarding the beginning of the Pratts' lease period are not material to whether the CR 2A agreement is enforceable.

"Normal contract principles apply" to CR 2A agreements. *In re Marriage of Pascale*, 173 Wn. App. 836, 841, 295 P.3d 805 (2013). The party seeking enforcement of a contract "need only prove the existence of the contract and the other party's objective manifestation of intent to be bound thereby." *Retail Clerks Health & Welfare Tr. Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944, 640 P.2d 1051 (1982). A person's signature on the contract is an objective manifestation of an intent to be bound. *Id.* After that, "the burden shifts to the party seeking to avoid the contract to prove a defense to the contract's enforcement." *Id.*

From their briefing below and on appeal, we discern the following defenses to enforcement as being raised by the Pratts: the Pratts signed the agreement under duress, the agreement was unconscionable, Bolivar materially breached the agreement, and Bolivar acted in bad faith. We discuss these defenses in turn.

*Duress*

The Pratts contend they signed the CR 2A agreement under duress due to ongoing harassment by the Burpees and Mr. Eastburg. We conclude that they fail to show their decision to sign the agreement was involuntary.

"Generally, circumstances must demonstrate a person was deprived of his free will at the time he entered into the challenged agreement in order to sustain a claim of duress."

*Retail Clerks*, 96 Wn.2d at 944-45. Duress must result "from the other's wrongful or oppressive conduct." *Id.* at 944. The fact a person entered a contract under stress or out of financial necessity is not sufficient. *Id.* Further, "a mere threat to exercise a legal right made in good faith" does not constitute duress. *Pleuss v. City of Seattle*, 8 Wn. App. 133, 137, 504 P.2d 1191 (1972).

The harassment identified by the Pratts does not rise to the level of duress overcoming their free will. The Pratts remained in their rented cottage despite the harassment. When served the 90-day notice, the Pratts hired an attorney, defended against the notice, refused Bolivar's offers, and, eventually, dictated the terms of the CR 2A agreement. If anything, the evidence indicates the Pratts brought their will to fruition, rather than being deprived of it. *See Culinary Workers & Bartenders Union, Local No. 596, Health & Welfare Tr. v. Gateway Cafe, Inc.*, 91 Wn.2d 353, 363, 588 P.2d 1334 (1979) ("[A]ppellants had counsel and through counsel proposed the challenged agreement. In light of this, their claim of duress lacks merit.").

*Unconscionability*

The Pratts argue the CR 2A agreement is unconscionable because it allowed Mr. Eastburg to become the sole owner of the property—information that Bolivar withheld from the Pratts. We disagree.

16

Procedural unconscionability arises from a party's lack of meaningful choice in entering a contract, considering all the circumstances surrounding it. *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 814, 225 P.3d 213 (2009). Considerations include the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were buried within the contract. *Id.* Substantive unconscionability, by contrast, arises when a contract or provision is one-sided and overly harsh. *Id.* at 815. The Pratts fail to show that either form of unconscionability exists here.

As discussed above, the Pratts had a meaningful choice about whether to enter into the CR 2A agreement. They were represented by counsel, actively negotiated the terms of the agreement over several weeks, and proposed the key terms themselves. The Burpees did not indicate they would be selling the property to Mr. Eastburg, but there is no evidence the Pratts ever asked about the sale nor is there evidence the Burpees misled them as to their intentions. Failure to disclose a detail that was not raised as an issue for negotiation does not make a contract procedurally unconscionable.

Similarly, a contract cannot be substantively unconscionable because it does not include a term the parties did not contemplate. The CR 2A agreement, as proposed by the Pratts, did not limit Bolivar's right to sell the property to any buyer it wished. The Pratts

argue that Bolivar should have known the Pratts would find it untenable for Mr. Eastburg to remain their landlord.  But absent a term in the CR 2A agreement to the contrary, Bolivar was not bound to select a buyer the Pratts found suitable.

Diana indicated at the summary judgment hearing that she believed Mr. Eastburg's harassment would end after they signed the CR 2A agreement.  But again, the Pratts did not attempt to make Mr. Eastburg's behavior part of the CR 2A agreement.

The actual, objectively manifested terms of the agreement show that both the Pratts and Bolivar benefited.  The Pratts benefited by remaining at the property until May 31, 2022, in accordance with their claimed third lease period.  Bolivar benefited by being able to sell the property in accordance with its stated intentions in the 90-day notice, and by Rochelle waiving her claims for her toe injury.  The agreement is not one-sided or harsh and is not substantively unconscionable.

*Material breach of the CR 2A agreement*

The Pratts contend that Mr. Eastburg materially breached the CR 2A agreement by attempting to constructively evict them after they signed the agreement.  In this regard, their primary complaints concern automatic sprinklers getting them wet and a bright motion-activated security light shining in their eyes as they walked past at night or

18

shining through their windows.  Mr. Eastburg had installed the security light several months before the settlement agreement.

The Pratts' "material breach" argument is a rehashing of their "substantive unconscionability" argument that we rejected above.  Again, the Pratts did not include any term in the CR 2A agreement that required Mr. Eastburg to cease behaviors the Pratts found offensive.  We agree with the trial court's conclusion—the Pratts' remedy is to bring a separate tort action against Mr. Eastburg rather than to avoid the terms of the agreement based on conduct the agreement did not prohibit.

*Bad faith*

The Pratts contend Bolivar presented the CR 2A agreement to them in bad faith and signed it in bad faith.  While on appeal, their bad faith argument is subsumed within their material breach and unconscionability arguments; on summary judgment, they argued bad faith under the covenant of good faith and fair dealing.  Because we engage in the same inquiry as the trial court when reviewing a summary judgment, we likewise address the Pratts' bad faith contention under the covenant of good faith and fair dealing.

In Washington, every contract contains an implied duty of good faith and fair dealing "that 'obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.'"  *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d

102, 112, 323 P.3d 1036 (2014) (quoting *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991)). The duty does not "add or contradict express contract terms and does not impose a free-floating obligation of good faith on the parties." *Id.* at 113. Instead, it arises in connection with terms agreed to by the parties, particularly when the contract gives one party discretion to determine a contract term. *Id.*

The Pratts identify as bad faith Mr. Eastburg's continued harassment and Bolivar's failure to inform them that Mr. Eastburg would be the new owner of the property. Neither allegation implicates the duty of good faith and fair dealing because neither touch on any term of the parties' CR 2A agreement. The agreement did not contemplate future harassment. The agreement did not restrict Bolivar's choice of buyers. The duty of good faith and fair dealing cannot add a term to the agreement nor does it impose a general duty of good faith. It only requires the parties to cooperate to fully perform the agreement—for example, where the CR 2A agreement provides that the Pratts shall sign a release agreement, the duty of good faith and fair dealing requires the parties to cooperate in achieving that aim.

We conclude that the Pratts have failed to establish a genuine issue of material fact with respect to the enforceability of the CR 2A agreement.

20

No. 38967-7-III
*Bolivar Real Estate v. Pratt*

ATTORNEY FEES

Bolivar requests attorney fees on appeal pursuant to the CR 2A agreement. We grant their request.

A court may award attorney fees only when authorized by contract, statute, or a recognized ground in equity. *Conway Constr. Co. v. City of Puyallup*, 197 Wn.2d 825, 838, 490 P.3d 221 (2021). Here, the CR 2A agreement contained a provision authorizing recovery of fees and costs by "[t]he prevailing party in any legal proceedings to enforce the terms of this Agreement." CP at 217. Bolivar is the prevailing party in this legal proceeding to enforce the CR 2A agreement; therefore, it is entitled to its attorney fees and costs in connection with this appeal.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Staab, J.

21